COURT OF APPEALS OF VIRGINIA


Present:   Judges Elder, Humphreys and Senior Judge Fitzpatrick
Argued at Alexandria, Virginia


DOROTHY JANE BEAN-BREWER

                                                    OPINION BY
v.        Record No. 1614-05-4            JUDGE LARRY G. ELDER
                                             OCTOBER 17, 2006

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
Richard B. Potter, Judge

William J. Baker for appellant.

Denise C. Anderson, Assistant Attorney General (Robert F.
McDonnell, Attorney General, on brief), for appellee.


Dorothy Jane Bean-Brewer (appellant) appeals from her jury trial conviction for child

neglect in violation of Code § 18.2-371.1(B).  On appeal, she contends the evidence was

insufficient to prove a "willful act or omission" amounting to criminal negligence, as required to

support a conviction under the statute.  We hold the evidence, viewed in the light most favorable

to the Commonwealth, was sufficient, and we affirm appellant's conviction.

I.

BACKGROUND

On August 31, 2004, appellant was a day care provider licensed by the State of Virginia

to provide child care in her home and had been so licensed since at least 2000.  As a licensed day

care provider, appellant was "expected to be in full compliance with" certain "minimum

standards" promulgated by the Virginia Department of Social Services.  Appellant received a

copy of the Department's minimum standards when she was licensed, and confirmed that, in the

summer of 2004, she had a copy of those standards.  Those standards defined a "[c]hild," for

purposes of "child day programs," as "an individual under 13 years of age" and provided that appellant--as the responsible "care giver" operating a "child day program" "assum[ing] responsibility for the supervision, protection, and well-being of" such a child or children--could not have an assistant care giver under the age of fourteen. 22 Va. Admin. Code 40-110-10. The standards also provided as follows:

> Children shall be supervised by a care giver at all times. Children shall not be left alone in the care of an assistant under 18 years of age while in care.

> Children shall be supervised in a manner which ensures that the care giver is aware of what the children are doing at all times and can promptly assist or redirect activities when necessary. In deciding how closely to supervise children, providers shall consider the following:
>
> 1. Ages of the children;
> 2. Individual differences and abilities;
> 3. Layout of the house and play area;
> 4. Neighborhood circumstances or hazards; and
> 5. Risk activities children are engaged in.

22 Va. Admin. Code 40-110-650, 40-110-710. The Department's regulations also provided that a person operating a "family day home," or in-home day care facility, could have a maximum of 12 children, not including the provider's own children, at any one time. 22 Va. Admin. Code 40-110-30.

On August 31, 2004, the day at issue, appellant had--in addition to her own two children, a six-year-old girl and a five-year-old boy--eleven or twelve children in her care. One of those children was a ten month old named Danyelle. Danyelle's mother, Tricia, testified that she and her husband had obtained appellant's name from a list of providers licensed through the Department of Social Services, and appellant confirmed to Danyelle's parents that she was a

licensed provider. Tricia's understanding was that appellant was the provider and that appellant, either primarily or solely, would be the person caring for Danyelle.

Despite appellant's representations, the evidence established that appellant routinely delegated many of her child care responsibilities for Danyelle and her other younger charges to the older children in her care, an eleven-year-old girl, Jordan, and her eight-year-old brother, Miles. Jordan testified that on August 31, 2004, the children ate breakfast and watched television on the first floor until 9:00 or 9:30 a.m., at which time Jordan took nine or ten children, including Danyelle, who were "babies until about kindergarten age," to the basement. Jordan changed four of the younger children who weren't yet potty trained and "play[ed] games and whatnot" with the children. Appellant, who "would come down" only "on[c]e or twice a week," did not go downstairs with Jordan and the others at that time. Other than appellant, no adults provided supervision in the basement. Appellant came down later in the morning on August 31, 2004, "to ask everybody what kind of pizza they wanted" for lunch. Appellant then went back upstairs, and without adult supervision, Jordan, Miles, and appellant's two children, who were six and five, made sure the others washed their hands and had their diapers changed or used the bathroom before they went upstairs for lunch.

After lunch, the younger children returned to the basement for their naps. As on most days, Jordan was responsible for getting the children down for their naps while appellant cleaned up from lunch. Jordan put the mats and blankets down for the older children and put the babies, including Danyelle, in their cribs. Neither appellant nor any other adult was in the basement at the time.

Sometime between 1:00 and 2:00 p.m., while the younger children were napping, appellant, appellant's two children, Jordan, and Miles were in the living room when a truck arrived to deliver a new bunk bed appellant had ordered for her six-year-old daughter's room.

Appellant, her children, Jordan, and Miles all carried parts of the bed to the daughter's second-floor room. Sometime later, the parent of one of appellant's charges, a one-year-old girl, arrived with an adult male. Appellant came down to the first floor, and she sat with the girl's mother and the mother's friend on the first floor for a while. Jordan went to the basement to awaken the mother's child and brought the girl upstairs to her mother. Appellant, Jordan, the mother and her daughter, and the mother's male friend then went upstairs to put the bed together.

Later on, appellant sent Jordan to the refrigerator in the garage to get some alcoholic "fruit" "coolers," and appellant drank two coolers. At another point, Jordan "had to go [to the basement] and make sure everybody was okay, because we thought we were hearing kids playing down there." When the mother of another child arrived, Jordan went to the basement to get that child and handed her over to her mother.

Jordan testified that, on an ordinary afternoon, appellant would usually accompany her to the basement to awaken the children from their naps and that appellant did so "because some of the kids . . . didn't really like getting up." On the afternoon of August 31, 2004, however, appellant sent Miles, Jordan's eight-year-old brother, "to go put on the lights and get all the kids up . . . and give them a snack." Miles had never awakened the children before. Miles testified that appellant specifically told him to get Danyelle out of her crib.

When Miles arrived in the basement, Danyelle was already awake. When eight-year-old Miles attempted to remove twenty-pound Danyelle from her crib, he hit her nose on the rail of the crib, and then he dropped her on her side on the floor next to the crib. Miles then picked Danyelle up and "sat her on the floor," and she began to crawl around. When another of the children, a four year old, told Miles that Danyelle's mouth was bleeding, Miles took Danyelle upstairs to appellant and reported the bleeding.

When Miles brought the bleeding Danyelle upstairs on the afternoon of August 31, 2004, appellant told Miles to give Danyelle to Jordan, and appellant went to get a wet washcloth to stop the bleeding. Jordan testified she believed Danyelle was bleeding because she was teething. Danyelle was "screaming at . . . the top of her lungs," and "she kept on wringing around in [Jordan's] arms while she" continued to "scream[] at the top of her lungs." Appellant then told Jordan to bring Danyelle into the bathroom, and when Jordan attempted to do so, Danyelle, who had "kept on squirming," hit her head on the door frame. Jordan then gave Danyelle to appellant "to make sure there [were] no . . . bumps or bruises on her head." Appellant kept Danyelle upstairs for a while to make sure her mouth had stopped bleeding.

While Danyelle remained upstairs with appellant, appellant sent Jordan to the basement to finish getting the children up and feed them a snack, which she did with the help of Miles and appellant's six-year-old daughter. Shortly after that, appellant sent Jordan to the basement with Danyelle to change her diaper. Danyelle's mother, Tricia, arrived to pick Danyelle up at the end of the day on August 31, 2004, while Jordan was in the basement changing Danyelle's diaper. No adults were present. When Tricia picked Danyelle up, Tricia "noticed Danyelle looked funny, puffy," "as if she had just gotten over a hard cry," and she "just didn't look right." Danyelle "went straight to [Tricia's] shoulder," and although Tricia was told Danyelle had just awakened from a nap, Danyelle "wanted to go right back to sleep again." Tricia tried to "glanc[e] at Danyelle in the mirror" but was unable to "get a really good look at her face." Tricia "went upstairs and . . . yelled up to [appellant] that [she] was there." Appellant came down from the second floor to the first floor. Tricia asked what had happened that day, but "there was no offer of information." When Tricia inquired about "some swelling and red marks around [Danyelle's] eye," appellant said "they were 'bed marks'" and that Danyelle had "napped from 1:30 p.m. - 4:30 p.m. and had a good day."

Within five minutes after Tricia arrived home with Danyelle, she and her husband decided Danyelle did "not seem right," and they took her to the Prince William Hospital Emergency Room. A head CT showed a small intracranial hemorrhage, or collection of blood in a place where it should not have been, around the temporal lobe, and Danyelle was transferred to the pediatric neurology unit at Fairfax Hospital. At Fairfax Hospital, Danyelle was documented as having the following injuries:

> She had extensive facial bruising, mainly on the left side of her face. She had a bruised left lower eyelid. She had . . . torn tissue underneath her upper lip [that was unrelated to teething]. She had bruises on her lower thighs, just above the knees, on both sides, and her CT scan of her head revealed she had a bruised brain.

Because bruising to the brain could cause seizures, Danyelle was admitted for observation and released two days later. Multiple x-rays and a subsequent bone scan indicated no fractures, and Danyelle appeared to recover fully.

The same evening Danyelle's parents took her to the emergency room, the police contacted appellant to inquire about how Danyelle sustained her injuries. The following day, September 1, 2004, a detective and a Child Protective Services worker questioned appellant's oldest charges, eleven-year-old Jordan and her eight-year-old brother, Miles, about how Danyelle sustained her injuries. Following that questioning, appellant was indicted for "commit[ing] a willful act or omission in the care of [Danyelle] that was so gross, wanton and culpable as to show a reckless disregard for human life." At trial, the Commonwealth presented the testimony of Jordan and Miles that appellant delegated many of her child care responsibilities over Danyelle and her other young charges to Jordan, Miles, and appellant's own two children, who were five and six at the time. Jordan and Miles also testified about how Danyelle sustained her injuries.

The Commonwealth offered testimony from Dr. Kent Hymel, a board-certified pediatrician with a subspecialty in child abuse and neglect. Dr. Hymel did not treat Danyelle directly but supervised the physician who did and reviewed Danyelle's medical records. Dr. Hymel testified that the injuries to the left side of Danyelle's "face, head [and] brain" could be explained by "a fairly forceful impact against the left side of her face over a very broad surface." Dr. Hymel also offered "an opinion as an expert in child abuse and neglect" as to "whether an 8-year-old would have the ability to care for a 10-month-old child, to a reasonable degree of medical certainty." He explained that the daily needs of a ten month old would be "[n]utrition, hydration, clothing and warmth, safety and obviously attention and love." He opined that some eight year olds could dress a baby, feed it a bottle and "[maybe] even . . . change a diaper" but that he had never encountered an eight year old with "the maturity, track record of mature behavior themselves to do all of the things that [he] summarized in the list of required tasks." He said that "supervision," "in particular," "is what would concern" him because of the increasing mobility of a child of Danyelle's age.

Following her conviction, appellant noted this appeal.

II.

ANALYSIS

Under settled principles, we view the evidence and all reasonable inferences fairly deducible therefrom in the light most favorable to the Commonwealth, and we must "affirm the judgment of the trial court unless plainly wrong or without evidence to support it." Barrett v. Commonwealth, 268 Va. 170, 179, 597 S.E.2d 104, 108 (2004).

Code § 18.2-371.1 provides in relevant part as follows:

> B. 1. Any parent, guardian, or other person responsible for the care of a child under the age of 18 whose willful act or omission in the care of such child was so gross, wanton and

culpable as to show a reckless disregard for human life shall be guilty of a Class 6 felony.

On appeal, appellant disputes only the sufficiency of the evidence to prove she committed a "willful act or omission in the care of [Danyelle] that was so gross, wanton and culpable as to show a reckless disregard for human life."  Code § 18.2-371.1(B)(1).

The Supreme Court recently clarified the element of intent required to support a conviction under Code § 18.2-371.1:  "The term 'willful act' imports knowledge and consciousness that injury will result from the act done.  The act done must be intended or it must involve a reckless disregard for the rights of another [that] will probably result in an injury."  Barrett, 268 Va. at 183, 597 S.E.2d at 111.  Thus, the issue of intent requires an examination not only of the act that created the risk, but also of the degree to which the accused "was [or should have been] aware of the danger" that resulted from the act.  Ellis v. Commonwealth, 29 Va. App. 548, 555, 513 S.E.2d 453, 457 (1999); see Kelly v. Commonwealth, 42 Va. App. 347, 356, 592 S.E.2d 353, 357 (2004) (noting that criminal negligence "'is judged under an objective standard and, therefore, may be found to exist where the offender either knew or should have known the probable results of his acts'" (quoting Conrad v. Commonwealth, 31 Va. App. 113, 121-22, 521 S.E.2d 321, 325-26 (1999) (en banc))).

A showing of "inattention and inadvertence," i.e., simple negligence, is insufficient to justify the imposition of a criminal penalty.  Ellis, 29 Va. App. at 555-56, 513 S.E.2d at 457; see also Commonwealth v. Duncan, 267 Va. 377, 384, 593 S.E.2d 210, 214 (2004).  Rather, the negligence must be "gross negligence" and must be

> "accompanied by acts of commission or omission of a wanton or willful nature, showing a reckless disregard or indifferent disregard of the rights of others, under circumstances reasonably calculated to produce injury, or which make it not improbable that injury will be occasioned, and the offender knows, or is charged with the knowledge of, the probable result of [her] acts."

Barrett, 268 Va. at 183, 597 S.E.2d at 111 (quoting Cable v. Commonwealth, 243 Va. 236, 240, 415 S.E.2d 218, 220 (1992)).

Appellant, citing Ellis, contends "[t]he mere fact that [she] did not stay in the same room as the children she had in her care and relied on the older children to assist her in caring for the younger children does not constitute a willful act or omission as required for [a] conviction" under Code § 18.2-371.1(B). Under the specific facts of this case, we disagree.

Ellis involved a mother who turned on a burner of her apartment's gas stove to light a cigarette and then left the apartment to visit a friend in a nearby apartment while her two young children were napping. Ellis, 29 Va. App. at 551-52, 513 S.E.2d at 455. A fire broke out in Ellis's apartment shortly after she left. Id. at 552-53, 513 S.E.2d at 455. In reversing Ellis's conviction, we reasoned as follows:

> While appellant . . . purposefully and intentionally left her apartment . . . , the intent which is relevant to our determination of "bad purpose" does not relate simply to why she left the apartment. Rather, it relates to the degree to which she was aware of the danger when leaving her children unattended. Here, no evidence establishes that . . . she acted with knowledge or consciousness that her children would be injured as a likely result of her departure to visit a neighbor for a short period of time in another residential building.
>
> [Further, the evidence] fails to show that appellant left the apartment knowing the burner was on and in conscious disregard of the likely ignition of a grease fire that would ultimately endanger the lives of her children. . . .
>
> . . . [I]nattention and inadvertence have not been heretofore equated with actions taken willfully, thus making them subject to criminal penalty. Similarly, appellant's inability to "see anything wrong with what she had done by going outside and leaving the children alone in the apartment," while clearly misguided, is reflective of simple negligence, not criminal conduct.

Id. at 555-56, 513 S.E.2d at 457 (citations omitted).

Here, by contrast, appellant was a licensed child care provider with a duty to be aware of and comply with the Department of Social Services' minimum standards applicable to a paid provider caring for the children of others in her home. See 22 Va. Admin. Code 40-110-40. Those regulations required the children in appellant's care to be "supervised by a care giver at all times" and required that the care giver be fourteen years of age or older. Id. 40-110-10, 40-110-650. They also provided that this supervision be conducted "in a manner which ensures that the care giver is aware of what the children are doing at all times" and permits the care giver to "*promptly assist or redirect activities when necessary*." Id. 40-110-710 (emphasis added). Finally, those regulations provided that, in determining how closely to supervise children, the provider "shall consider," *inter alia*, "[a]ges of the children" and "[i]ndividual differences and abilities." Id.

Although violation of the Department's minimum standards does not show criminal negligence as a matter of law, cf. King v. Commonwealth, 217 Va. 601, 605-06, 231 S.E.2d 312, 316 (1977) (holding conviction for reckless driving, standing alone, is insufficient to prove criminal negligence); Darnell v. Commonwealth, 6 Va. App. 485, 489-92, 370 S.E.2d 717, 719-21 (1988) (applying King rationale to violation of statute prohibiting reckless handling of firearm and rejecting argument that such reckless handling equates to recklessness required to prove criminal negligence element of involuntary manslaughter), violation of those minimum standards is relevant to an examination of whether appellant knew or should have known her actions "'ma[d]e it not improbable that injury'" would occur. Cable, 243 Va. at 240, 415 S.E.2d at 220 (quoting Bell v. Commonwealth, 170 Va. 597, 611-12, 195 S.E. 675, 681 (1938)). We hold that the evidence as a whole, including the Department's minimum standards for in-home child care providers and appellant's failure to comply with them, viewed in the light most

favorable to the Commonwealth, supports a finding that appellant should have known her acts probably would result in injury.

Here, the evidence established that appellant routinely chose to allow two of the older children in her care--Jordan, an eleven-year-old girl, and Miles, Jordan's eight-year-old brother--to provide extended supervision for the children entrusted to appellant's care, most of whom were infants, toddlers, and preschoolers. Under the evidence in the record, viewed in the light most favorable to the Commonwealth, after appellant fed the children on the first floor of her home on the morning of August 31, 2004, Jordan took the children to the basement play area at about 9:30 a.m., and appellant visited the basement briefly on only one occasion prior to lunch, in order to determine what kind of pizza the children wanted. Jordan testified that appellant would come down and play with the younger children in the basement only "on[c]e or twice a week" and that the rest of the time, Jordan, Miles, and appellant's two children were in charge. Prior to lunch on August 31, 2004, eleven-year-old Jordan, with the help of eight-year-old Miles and appellant's five- and six-year-old children, helped appellant's younger charges wash their hands and use the bathroom, and Jordan changed diapers as necessary. After lunch on the first floor, which appellant supervised, appellant remained on the first floor and had Jordan return with the children to the basement, where Jordan put three infants, including ten-month-old Danyelle, in their cribs; set out mats and blankets for the other young children; and waited until they all fell asleep.

Shortly thereafter, appellant received a delivery, and all the children who were not napping helped carry the item delivered--a bed--up to the second floor of the home, two floors above the sleeping children, where appellant became preoccupied with assembling it. Appellant consumed two alcoholic beverages while on the second floor, and the evidence established she did not return to the basement at any time during the course of the afternoon. When two

- 11 -

different mothers arrived to pick up their infants or toddlers, appellant sent Jordan to the basement to get each of the children. When appellant thought she heard some of the children stirring in the basement, she again sent Jordan to the basement to check on them.

Finally, the evidence, viewed in the light most favorable to the Commonwealth, establishes that when appellant determined it was time for the remaining children to arise from their naps, she sent eight-year-old Miles to the basement with specific instructions to rouse the children and remove ten-month-old Danyelle from her crib. While removing Danyelle from the crib, Miles hit Danyelle's nose on the rail and then dropped her on the floor outside the crib. Eight-year-old Miles was both too young to safely remove twenty-pound Danyelle from the crib and too young to realize that Danyelle might have been hurt when he dropped her. He made no effort to seek help until another of the children told him Danyelle was bleeding. Even when Miles took Danyelle upstairs to appellant, he apparently did not inform her that he had dropped Danyelle. Finally, instead of taking physical custody of Danyelle, who was "screaming at . . . the top of her lungs" when Miles brought her to the second floor, appellant told Miles to give Danyelle to Jordan, who was unable to prevent the flailing Danyelle, who was still screaming at the top of her lungs, from hitting her head on the frame of the bathroom door.

Thus, the evidence proves appellant failed repeatedly in her duty to supervise the children, particularly eight-year-old Miles and ten-month-old Danyelle, "in a manner which ensures that the care giver is aware of what the children are doing at all times" and permits the care giver to "promptly assist or redirect activities when necessary." See 22 Va. Admin. Code 40-110-710. The obvious, stated purpose of these minimum standards is to provide for "the supervision, protection, and well-being of [the children]" in the program. Id. 40-110-10. Here, by directing Miles to awaken the children and remove Danyelle from her crib, appellant delegated to Miles responsibilities that the Department's minimum standards indicated she was

not authorized to delegate and that the expert testimony of Dr. Kent Hymel, a board-certified pediatrician with a subspecialty in child abuse and neglect, established an eight year old would not be mature enough to provide with any degree of consistency. The evidence as a whole establishes that, by entrusting Danyelle's care to Miles, appellant engaged in a willful act or omission in the care of Danyelle "'which ma[d]e it not improbable that injury [would] be occasioned,'" see Barrett, 268 Va. at 183, 597 S.E.2d at 111 (quoting Cable, 243 Va. at 240, 415 S.E.2d at 220), and that, unlike the defendant in Ellis, appellant "'knew or should have known the probable results of [her] acts,'" see Kelly, 42 Va. App. at 356, 592 S.E.2d at 357 (quoting Conrad, 31 Va. App. at 121-22, 521 S.E.2d at 325-26).

Even assuming, as appellant argues, that she did not instruct Miles to remove Danyelle from her crib and that Miles either misunderstood her directions or chose to remove Danyelle from her crib on his own initiative, appellant had a duty to supervise eight-year-old Miles in a manner that permitted her to "*promptly assist or redirect [his] activities when necessary*." 22 Va. Admin. Code 40-110-710 (emphasis added). Because appellant was on the second floor of her home when she sent Miles to the basement to awaken the children, she was wholly unable to "promptly assist or redirect [his] activities" before Danyelle was injured. Cf. Kelly, 42 Va. App. at 355-57, 592 S.E.2d at 357-58 (finding father criminally negligent under Code § 18.2-371.1(B) where, although he instructed sixteen-year-old son or another of his "older kids" to "take the children inside" from the car, his twenty-one-month-old daughter remained strapped in car seat in hot automobile and died as a result, and evidence established father knew situation had occurred before, although without fatal results). Appellant was also unable to adequately assess Danyelle's injuries or inform Danyelle's mother about them because she did not know what had transpired. Further, although appellant was present when Miles brought the bleeding and crying Danyelle upstairs and when Danyelle hit her head on the bathroom door frame while in Jordan's

arms, appellant told Danyelle's mother nothing about what had happened to Danyelle, saying instead that the "swelling and red marks around [Danyelle's] eyes" were "'bed marks'" from an extended nap and that Danyelle had "had a good day."

Thus, appellant's behavior was more culpable than the behavior of the mother in Ellis. Appellant, unlike Ellis, was licensed and paid to watch the children of others; knew she was required to abide by the Department's minimum standards for operating her in-home day care facility; and was or should have been aware of the danger posed by her acts, which exhibited "'a reckless disregard . . . of the rights of others, under circumstances . . . which ma[d]e it not improbable that injury [would] be occasioned.'" Barrett, 268 Va. at 183, 597 S.E.2d at 111 (quoting Cable, 243 Va. at 240, 415 S.E.2d at 220).

### III.

For these reasons, we hold the evidence, viewed in the light most favorable to the Commonwealth, was sufficient to prove appellant committed a "willful act or omission" amounting to criminal negligence, as required to support a conviction under the statute. Thus, we affirm appellant's conviction.

Affirmed.