COURT OF APPEALS OF VIRGINIA

Present: Judges Humphreys, Beales and Decker
Argued by teleconference

LAKESHA LANIKA ARTIS

MEMORANDUM OPINION[*] BY
v.      Record No. 1020-14-1      JUDGE RANDOLPH A. BEALES
JUNE 2, 2015

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF THE CITY OF SUFFOLK
Carl E. Eason, Jr., Judge

Patricia A. Cannon (Patricia A. Cannon, PC, on brief), for appellant.

Susan Baumgartner, Assistant Attorney General (Mark R. Herring,
Attorney General, on brief), for appellee.

Lakesha Lanika Artis (appellant) was found guilty of involuntary manslaughter, in violation

of Code § 18.2-36, and guilty of felony child abuse and neglect in violation of Code

§ 18.2-371.1(A) for unrelated earlier conduct involving the victim. She was sentenced to two years

for the conviction for felony child abuse and neglect and to six months for the involuntary

manslaughter conviction.

Appellant appeals her conviction for involuntary manslaughter on the ground that the

evidence was simply insufficient beyond a reasonable doubt to support her involuntary

manslaughter conviction. Specifically, appellant contends that the evidence was insufficient

because (1) it failed to establish that her decision not to seek additional medical care for the victim

was criminally negligent, and (2) it failed to establish that any criminally negligent behavior on the

part of appellant was the proximate cause of the victim's accidental death.

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

## I. BACKGROUND

We consider the evidence on appeal, "'in the light most favorable to the Commonwealth, as we must since it was the prevailing party'" in the trial court. Beasley v. Commonwealth, 60 Va. App. 381, 391, 728 S.E.2d 499, 504 (2012) (quoting Riner v. Commonwealth, 268 Va. 296, 330, 601 S.E.2d 555, 574 (2004)).

### A. The Suboxone Ingestion

The events giving rise to this appeal started on the afternoon of July 16, 2011. On that afternoon, two-year-old Destiney Riddick – appellant's daughter and the victim in this case – was under the care of appellant's mother-in-law (Kimberly Artis) and appellant's mother-in-law's boyfriend (Steven Bullock). At some point that afternoon, Bullock noticed that the Mentos container in which he had been storing his Suboxone[1] was empty. Upon realizing this, Bullock became frantic. Kimberly Artis called to E.A. – another toddler under Kimberly Artis's and Bullock's care at the time – and Destiney to ask them who "ate the candy." E.A. pointed to Destiney "and she immediately was like sorry, Grandma, sorry." Destiney had ingested approximately one to two tablets of Suboxone. Hoping that food might help Destiney absorb the Suboxone, Kimberly Artis prepared Destiney a glass of milk and a peanut butter and jelly sandwich. Destiney did not want the food because she was not hungry, so Kimberly Artis took Destiney to the bathroom to try to make her vomit. Destiney would not vomit. Poison control was called. Immediately after speaking with poison control, Kimberly Artis and Bullock gathered the children together and went straight to the hospital. Appellant was notified about the situation while she was at work, and she rushed to the hospital.

---

[1] Suboxone is a medication that contains both buprenorphine and naloxone. Buprenorphine is an opiate, and naloxone actually reverses the effects of narcotics. Suboxone is commonly used to treat opiate addictions.

## B. Destiney's Visit to the Hospital

Destiney arrived at the hospital at 6:14 p.m. She had ingested the Suboxone approximately twenty to thirty minutes prior to arriving at the hospital. Hospital personnel took Destiney's first set of vital signs at 6:21 p.m. At that time, Destiney's temperature was 97.5 degrees Fahrenheit, her respiratory rate was at 22 breaths per minute, and her blood oxygen level was at 96%. The hospital apparently never took Destiney's temperature again, but did continue to monitor her other vital signs for the next hour. At 6:46 p.m., Destiney's respiratory rate had fallen to 19 breaths per minute. Just fourteen minutes later, at 7:00 p.m., Destiney's respiratory rate was at 13 breaths per minute, and her blood oxygen level was at 92%. The record at trial indicated hospital personnel took the last set of vital signs at 7:15 p.m., even though she was not discharged until 9:00 p.m. At 7:15 p.m., Destiney's respiratory rate was at 16 breaths per minute, and her blood oxygen level was at 93%.

Dr. Richard Hamilton, an emergency medicine and toxicology expert for the defense, testified to the jury as to the significance of these vital signs. Noting that Destiney's respiratory rate decreased from 22 to 19 to 13, Dr. Hamilton testified that such a decrease indicated "respiratory depression" and that Destiney's vital signs were "markers of the toxic effects of the Suboxone." According to Dr. Hamilton, a normal respiratory rate for a child was between twenty and thirty breaths per minute, and a normal blood oxygen level for a child was between 95 and 100%. One of the Commonwealth's witnesses, Dr. Joel Michael, who was qualified as an expert in emergency medicine, testified that a normal respiratory rate for a child would be "around twenty" breaths per minute and that a normal blood oxygen level would be "about above 92 percent."

In addition to recording vital signs of Destiney, hospital personnel also made and recorded observations about Destiney's physical appearance and activity level. Medical records indicate that at 6:35 p.m., Destiney's pupils were "very minimally reactive" and that Destiney was "sluggish and

- 3 -

sleepy" and "lethargic." In addition, medical records indicated that at 6:49 p.m., Destiney "appear[ed] to be sleepy" and that her pupils still displayed "minimal reaction."

Testimony from Kimberly Artis and appellant corroborate the portions of the medical records regarding Destiney's physical appearance and activity level. Kimberly Artis testified that sometime after 6:30 p.m. she "[saw] [Destiney] getting drowsy." In addition, Kimberly Artis noticed that Destiney's words "just came out slurrish."

Dr. Hamilton and one of the Commonwealth's expert witnesses, Dr. Rutherford Rose, both testified as to the combined significance of Destiney's physical appearance, activity level, and vital signs. According to Dr. Rose, most people who have experienced an opiate overdose "will get very small pupils," will "complain of lethargy," and "some might have, again, a decreased respiratory rate." Dr. Hamilton testified that, in his opinion, Destiney, "showed signs and symptoms of Suboxone overdose and . . . should have been admitted to the hospital." Dr. Hamilton based his opinion on the deterioration in blood oxygen levels and respiratory rates while Destiney was in the hospital. In arriving at his determination that Destiney was displaying signs of Suboxone poisoning, Dr. Hamilton also relied on the fact that Destiney was drowsy and on the fact that Destiney's pupils had minimal reaction. Dr. Hamilton noted, however, that to a layman, somebody who was experiencing an opiate overdose like Destiney's would "just look sleepy."

The hospital personnel made the decision to discharge Destiney at 9:00 p.m. At that time, appellant received a set of *generic* discharge instructions, which read, in relevant part, as follows:

> Discharge Instructions:
>
> *Nontoxic* Ingestion
>
> *Your exam shows your ingestion is not likely to cause serious medical problems.* Further treatment is not needed at this time. If you have vomited since your ingestion, you should not drink or eat for at least 2-3 hours. Then start with small sips of clear liquids until your stomach settles. . . .

Sometimes the effects of drugs and other substances can be delayed.

SEEK IMMEDIATE MEDICAL CARE IF YOU DEVELOP:
- Confusion, sleepiness, agitation, or difficulty walking.
- Breathing problems, a cough, difficulty swallowing, or excess mucus.
- Stomach ache, repeated vomiting, or severe diarrhea.
- Weakness, fever, or dehydration.

(Emphasis added). In the section of the discharge papers entitled "ED Course/Medical Decision Making," the note read as follows: "Pt. here for possible ingestion of Suboxone . . . Pt has remained awake, alert with No respiratory difficulty during her ED course. Pt is stable discharge. Parents re-assured." According to appellant, Dr. Walter Dixon, the attending physician who never even testified at trial, told appellant that "Destiney would be okay," that if "she wanted to sleep, [appellant should] let her sleep," and that if "she wanted to eat, [appellant should] let her eat." In addition, Detective Burke testified that appellant had told him during a police interview that Dr. Dixon had assured her that the medication that Destiney had ingested "would wear off." According to appellant, Destiney was still drowsy at the time of discharge.

Dr. Hamilton opined as to the relevant significance of the discharge instructions. According to Dr. Hamilton, the discharge instructions did not apply to Destiney because they were for asymptomatic ingestion – and Destiney was not, in Dr. Hamilton's opinion, asymptomatic. In responding to the prosecutor's question whether there were any indications of Suboxone overdose at the time of Destiney's release, Dr. Hamilton responded as follows:

Well, one of the problems with her stay in the emergency department is that we have vital signs for only a period of that time. The last hour of her stay has no vital signs and if they had done an additional set of vital signs sometime during that, and traditionally in the emergency department you do a set of vital signs before the patient is discharged, in all probability they would have found what would be considered to be decreased, if not decreased further.

\* \* \* \* \* \* \*

- 5 -

> She was discharged with the signs and symptoms of Suboxone poisoning present. She was lethargic, she was drowsy, she had small pupils, her respiratory rate was decreased and her oxygen level was below normal.

Referring to the note under the "ED Course/Medical Decision Making," Dr. Hamilton opined that it was "absolutely incorrect" for the hospital to conclude that Destiney did not have respiratory difficulty, that Destiney "was not stable and should never have been discharged," and that it was "misleading to the parents" to give reassurances that Destiney would be okay.

### C. Appellant's Care for Destiney at Home

After Destiney was discharged from the hospital at 9:00 p.m., she and appellant went home. After Destiney arrived home, she was "seeing flies" that were not actually in the room, cried out that "Chuck E. Cheese . . . [was] going to get [her]," "had no balance," and was "real hot, like burning hot." Throughout the night, appellant made efforts to get Destiney to go to sleep, but she was unsuccessful. At some point during the evening, appellant prepared a roast beef sandwich, Doritos, and Sprite for Destiney, but Destiney did not want to eat the meal. Appellant also administered a fever reducer to Destiney. Appellant and her husband did leave the home around 10:30 p.m. that night to go to McDonald's, but they left Destiney in the care of Kimberly Artis and Steven Bullock for the short period of time that they were at McDonald's. In the early morning hours of July 17, 2011, appellant lay down beside Destiney and rubbed her hair and back for around twenty minutes. Appellant gave Destiney a kiss, and Destiney finally fell asleep by 4:00 a.m.

### D. Destiney's Death

The next morning, around 8:30 a.m., appellant called out to Destiney to see if she needed to use the restroom. Destiney did not respond. At that point, appellant went to Destiney's bedroom. Appellant touched Destiney and noticed she was cold. Appellant started screaming for her husband. Appellant's husband came into the bedroom and immediately began to administer CPR on Destiney, but to no avail. Emergency personnel were summoned to the residence. Destiney arrived

at the hospital at 9:58 a.m. Medical records indicate that Destiney arrived at the emergency room "with cold extremities, warm core, vomit to the mouth, face and hair" and that she "was unresponsive, w/out pulse or resp., and asystole on cardiac monitor." After repeated attempts to resuscitate Destiney, medical personnel pronounced her dead at 10:39 a.m. According to the autopsy report, the cause of death was buprenorphine poisoning.

## II. ANALYSIS

Appellant's assignment of error challenges the sufficiency of the evidence to support her involuntary manslaughter conviction. "When a defendant challenges the sufficiency of the evidence, we view the evidence and all reasonable inferences in the light most favorable to the Commonwealth, the prevailing party in the trial court." Rowland v. Commonwealth, 281 Va. 396, 399, 707 S.E.2d 331, 333 (2011) (citing Jay v. Commonwealth, 271 Va. 510, 524, 659 S.E.2d 311, 319 (2008)). "The judgment of conviction will be reversed only when the ruling is plainly wrong or without evidence to support it." Cordon v. Commonwealth, 280 Va. 691, 694, 701 S.E.2d 803, 805 (2010) (citing Maxwell v. Commonwealth, 275 Va. 437, 442, 657 S.E.2d 499, 502 (2008)). "'[I]t is just as obligatory upon the appellate court to set aside . . . the judgment of a court, when it is, in its opinion, contrary to the law and evidence, and therefore plainly wrong, as it is to sustain it when the reverse is true.'" Preston v. Commonwealth, 281 Va. 52, 57, 704 S.E.2d 127, 129 (2011) (quoting Hickson v. Commonwealth, 258 Va. 383, 387, 520 S.E.2d 643, 645 (1999)).

While involuntary manslaughter is a Class 5 felony, it is not statutorily defined. See Code § 18.2-36. The Supreme Court has explained the elements of involuntary manslaughter as follows:

> The crime of common law involuntary manslaughter has two elements: (1) the accidental killing of a person, contrary to the intention of the parties; and (2) the death occurs in the defendant's prosecution of an unlawful but not felonious act, or in the defendant's improper performance of a lawful act. To constitute involuntary manslaughter, the "improper" performance of a lawful

- 7 -

act must amount to an unlawful commission of that lawful act, manifesting criminal negligence.

Noakes v. Commonwealth, 54 Va. App. 577, 585, 681 S.E.2d 48, 51-52 (2009) (*en banc*) (quoting West v. Dir., Dep't of Corr., 273 Va. 56, 63-64, 639 S.E.2d 190, 195 (2007) (internal citations omitted)), aff'd, 280 Va. 338, 699 S.E.2d 284 (2010). "To prove a defendant's criminal negligence in relation to an otherwise lawful act, the Commonwealth must show that the performance was so improper as to constitute negligence so gross and culpable as to indicate a callous disregard of human life." Id. at 586, 681 S.E.2d at 52 (citing Beck v. Commonwealth, 216 Va. 1, 4, 216 S.E.2d 8, 10 (1975)).

> The word "gross" means "aggravated or increased negligence" while the word "culpable" means "deserving of blame or censure." "'Gross negligence' is culpable or criminal when accompanied by acts of commission or omission of a wanton and willful nature, showing a reckless or indifferent disregard of the rights of others, under circumstances reasonably calculated to produce injury, or which make it not improbable that injury will be occasioned, and the offender knows, or is charged with the knowledge of, the probable results of his acts."

Morris v. Commonwealth, 272 Va. 732, 739, 636 S.E.2d 436, 439-40 (2006) (quoting Barrett v. Commonwealth, 268 Va. 170, 183, 597 S.E.2d 104, 111 (2004)) (internal citation omitted). "Thus, the issue of the accused's mental state requires 'an examination not only of the act that created the risk, but also of the degree to which the accused was [or should have been] aware of the danger that resulted from the act.'" Shanklin v. Commonwealth, 53 Va. App. 683, 688, 674 S.E.2d 577, 580 (2009) (quoting Bean-Brewer v. Commonwealth, 49 Va. App. 3, 11, 635 S.E.2d 680, 684 (2006) (internal quotation omitted) (alteration in the original)). In addition, "[t]he Commonwealth must show more than mere 'inattention and inadvertence;' the defendant's negligence must rise to the standard of 'gross negligence.'" Id. (citations omitted).

Viewing the evidence in the light most favorable to the Commonwealth (as we must since it was the prevailing party at trial), a fact finder simply could not find appellant guilty beyond a

reasonable doubt of involuntary manslaughter. Appellant's decision not to take Destiney back to the hospital during the next few hours that elapsed during the night after the hospital had just released her at 9:00 p.m. – which, according to the Commonwealth, properly forms the sole basis for appellant's conviction – simply did *not* amount to criminal negligence.[2]

First, the evidence does not show that appellant could have known that failure to take Destiney back to the hospital so soon after her discharge would pose a danger to Destiney's life. The discharge instructions that appellant received were entitled "*Nontoxic* Ingestion." Moreover, the discharge instructions stated that "[y]our exam shows your ingestion is not likely to cause serious medical problems. Further treatment is not needed at this time." According to a note on the discharge papers, appellant was "re-assured." Consistent with that note, Dr. Dixon apparently told appellant that Destiney "would be okay" and that the Suboxone "would wear off." Appellant was entitled to rely on these assurances, and we certainly cannot say that appellant knew or should have known the probable result of not taking Destiney back to the hospital that night so soon after returning home with her. See Morris, 272 Va. at 739, 636 S.E.2d at 439-40 (citing Barrett, 268 Va. at 183, 597 S.E.2d at 111).

Dr. Hamilton's uncontradicted testimony that Destiney was displaying symptoms of opiate overdose while Destiney was still at the hospital further supports a finding that appellant's decision not to take Destiney back to the hospital did not amount to criminal negligence. According to Dr. Hamilton, Destiney's actual medical records suggest that she was displaying signs of an opiate overdose while she was at the hospital. Destiney's respiratory rate decreased

---

[2] Because the evidence is not sufficient to prove beyond a reasonable doubt that appellant's conduct was criminally negligent, a required element for the crime of involuntary manslaughter, this Court need not – and does not – reach the question of whether appellant's conduct was the proximate cause of the victim's death. "In this case, as in all others, we seek to decide cases 'on the best and narrowest ground available' from the record." Kirby v. Commonwealth, 50 Va. App. 691, 698 n.2, 653 S.E.2d 600, 603 n.2 (2007) (internal quotations and citations omitted).

from 22 to 13 in less than one hour. This rapid decrease was, according to Dr. Hamilton, a sign of the toxic effect of Suboxone. In addition, Destiney's pupils were minimally reactive, and she was apparently lethargic throughout her entire hospital visit. Given Destiney's significantly decreased respiratory rate, her minimally reactive pupils, and her lethargy, she should not, according to Dr. Hamilton, have been released from the hospital at the time she actually was released. Dr. Rose, one of the Commonwealth's experts, also testified that small pupils and a decreased respiratory rate were indicators of an opiate overdose. Given that the hospital chose to release Destiney despite the fact that, according to Dr. Hamilton and Dr. Rose, she was displaying signs of an opiate overdose, appellant cannot be said to have exhibited negligence so gross and culpable as to show a callous disregard for human life by her failure to take Destiney back to the hospital a few hours later that same night. If, as Dr. Hamilton testified, the hospital missed the signs of Suboxone poisoning, and given his testimony that viewing such signs as a layman can be quite subtle, appellant can hardly be found criminally negligent for not taking her child back to the hospital so soon after her discharge.

This Court's decision in Flowers v. Commonwealth, 49 Va. App. 241, 639 S.E.2d 313 (2007), does not compel a different result. In Flowers, after the appellant observed that several minors under her care were exhibiting symptoms of drug ingestion, she called a friend and told him that she had "an emergency" and that "something seemed wrong." 49 Va. App. at 245, 639 S.E.2d at 315. After learning the specific details of the situation, the friend advised Flowers that she needed to seek medical attention for the children. Id. Flowers did not call 911, however, and actually waited at least three hours before responding to the situation. Id. At least three hours after her friend advised her to seek medical attention for the children, Flowers called the father of one of the intoxicated minors to tell him that she believed his child "had taken something" and, consequently, "needed medical attention." Id. Flowers asked the father not to call his ex-wife or

the police, "because she did not 'want a bunch of hoopla' at her apartment." Id. The father rushed to Flowers's residence, and found his daughter "awake, but unable to stand." Id. The father drove the daughter to the hospital, where she was treated for possible ingestion of Ambien. Id. In finding that the evidence was sufficient to prove that Flowers acted "willfully" and in "reckless disregard of the life of another" within the meaning of Code § 18.2-371.1(B)(1),[3] this Court found that "a reasonable fact finder could find that Flowers' actions and deliberate inaction 'created a situation placing the child at risk of actual physical harm" and that "Flowers was aware that ingesting prescription or illicit drugs could pose a substantial risk for serious injury or death." 49 Va. App. at 249, 639 S.E.2d at 317.

In contrast to Flowers, the evidence in this case before the jury does *not* support a finding that appellant's decision not to take Destiney back to the hospital so soon after her discharge constituted a "willful omission" amounting to criminal negligence. Unlike the facts in Flowers, the particular facts of this case do not support a finding that appellant knew – or even should have known – that not taking Destiney back to the hospital would place Destiney in danger. In fact, the hospital gave appellant considerable reason to believe that Destiney was *not* in danger. Dr. Dixon assured appellant that Destiney would be "okay" and that the Suboxone would "wear off." The discharge instructions indicated that Destiney's ingestion was "nontoxic" and that Destiney's "ingestion is not likely to cause serious medical problems."

This Court's decision in Shanklin is highly instructive and dictates the result in this case. The victim in Shanklin sustained second-degree burns to both of his hands and to his left foot while in the care of his custodian and her boyfriend. 53 Va. App. at 686, 674 S.E.2d at 579.

---

[3] Code § 18.2-371.1(B)(1) provides that "[a]ny parent, guardian, or other person responsible for the care of a child under the age of 18 whose willful act or omission in the care of such child was so gross, wanton and culpable as to show a reckless disregard for human life shall be guilty of a Class 6 felony."

- 11 -

Instead of seeking medical treatment for the child, the custodian and the boyfriend put ointment on the burns, wrapped the burns with gauze, and secured the gauze in place with duct tape. Id. Later that night, the custodian's boyfriend dropped the child off at Shanklin's residence so that Shanklin could babysit the child. Id. The child was still wearing the duct taped bandages, and the boyfriend, who was Shanklin's son, informed Shanklin that the child had burned himself while playing in some hot water. Id. While the child was under Shanklin's care, he was "very sleepy," he took a four-hour nap, he fell asleep while trying to eat food, and he had to be carried to the bathroom. Id. The trial court found Shanklin guilty of felony child neglect in violation of Code § 18.2-371.1(B)(1) on the ground that the "'massive amount' of duct tape" plus the report from the child's caregiver that the child had sustained burns "should have alerted [Shanklin] to the fact that something was seriously wrong . . . [and] [Shanklin] should have immediately obtained medical help." Id. In reversing Shanklin's conviction, this Court held that "[t]he totality of the evidence fails to show that [Shanklin] recognized the severity of [the child]'s injuries and willfully disregarded the importance of obtaining medical assistance." 53 Va. App. at 689, 674 S.E.2d at 580. In arriving at its conclusion that the evidence failed to support a finding that Shanklin's failure to seek medical attention for the child was criminally negligent, this Court noted that Shanklin did not know how badly the child had been burned since the wounds were covered with gauze and duct tape. Id. at 689-90, 674 S.E.2d at 580. This Court also noted that "[Shanklin] had no reason to connect [the child]'s lethargy to his burns" because "[c]ommon sense indicates that there are numerous causes of lethargy in young children, many of which do not require immediate medical attention." Id. at 690, 674 S.E.2d at 581. This Court went on to say that "[w]hile an experienced medical professional might have noticed that such lethargy was indicative of something seriously wrong with [the child], we will not hold

- 12 -

[Shanklin] to a level of understanding beyond that of a reasonably prudent person of average education and experience." Id. at 691, 674 S.E.2d at 581 (citation omitted).

Just like in Shanklin, the evidence here simply fails to support the finding that appellant's decision not to seek further medical care for Destiney constituted a criminally negligent omission. Both Dr. Dixon and the discharge instructions led appellant to believe Destiney was "okay" when she left the hospital despite her lethargy, her minimally reactive pupils, and her decreasing respiratory rate. As Dr. Hamilton pointed out, to a layman, somebody who was experiencing an opiate overdose would "just look sleepy." While Destiney was feverish and was swatting at flies once she arrived at home, appellant had little reason to conclude that those symptoms so soon after being discharged from the hospital were life-threatening to Destiney. See Shanklin, 53 Va. App. at 690, 674 S.E.2d at 581. Of course, the generic discharge instructions that did not even apply to Destiney's condition instructed that medical attention should be sought in the event the patient had a fever, but we are loathe to create a rule allowing for an involuntary manslaughter conviction each time a parent neglects to seek medical attention for a child who displays a symptom listed within the boilerplate language of a set of generic discharge instructions.

Second, appellant's decision not to take Destiney back to the hospital was not so culpable as to indicate a callous disregard of human life. To the contrary, the record indicates that appellant displayed concern and care for Destiney after she arrived home from the hospital.[4]

_____

[4] The medical examiner's autopsy report in one particular place speculates that, given the toxic levels of buprenorphine in Destiney's blood at the time of her death, she may have ingested Suboxone for either the first or the second time after her first hospital visit. At trial, however, the Assistant Chief Medical Examiner testified that "from a clinical standpoint and from a forensic pathology standpoint, it's difficult for me to explain her circumstances, her clinical presentation with her autopsy and toxicology findings." In short, he testified that he simply could not explain the high levels of buprenorphine in Destiney's blood at the time of her death. As the prosecutor noted at trial (in response to one of the trial judge's questions about the second-degree murder indictment that the trial judge ultimately dismissed), there had been a

Appellant gave Destiney some food once the two had arrived home from the hospital. In addition, appellant made repeated efforts to put Destiney to bed. Appellant did leave Destiney for a period of time to go to McDonald's, but she left Destiney under the care of Kimberly Artis and Steven Bullock. Moreover, appellant gave a fever reducer to Destiney. Appellant also apparently lay down beside Destiney, stroked her hair and rubbed her back for about twenty minutes, and kissed her before Destiney finally fell asleep around 4:00 a.m. on July 17, 2011. Finally, not even twelve hours separated the time at which Destiney was released from the hospital and the time at which appellant found Destiney cold and lifeless, and there is nothing to indicate that Destiney was experiencing significant discomfort during that relatively short twelve-hour time period. For all these reasons, it strains credulity to say that appellant's decision not to seek additional medical care for Destiney – but to instead care for her at home over the few hours since the hospital discharged her – constitutes a callous disregard for human life.

### III. CONCLUSION

Viewing the evidence in the light most favorable to the Commonwealth, the evidence in this case simply does not support a finding beyond a reasonable doubt that appellant's decision not to take Destiney back to the hospital was *criminally negligent*. Accordingly, we must reverse appellant's conviction for involuntary manslaughter under Code § 18.2-36.[5]

<u>Reversed and dismissed.</u>

---

theory at one point earlier in the investigation of Destiney's death that there was perhaps a second ingestion of Suboxone after Destiney's initial hospital visit. Nevertheless, the Attorney General candidly states on brief to this Court that "[t]he Commonwealth did not pursue that point" at trial.

[5] Appellant's felony child abuse and neglect conviction under Code § 18.2-371.1(A) in this case stems from a completely separate set of facts in which appellant had, on an earlier occasion, hit Destiney with a coat hanger, leaving a scar on the child's back. That conviction and appellant's two-year sentence for it stand as they are not now before this Court because we denied that assignment of error when considering appellant's petition for appeal.