UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:  Judges Petty, Beales and AtLee
Argued at Richmond, Virginia


JOHN ELMORE GIBBS

                                                     MEMORANDUM OPINION* BY
v.       Record No. 1020-17-2            JUDGE RANDOLPH A. BEALES
                                                     APRIL 3, 2018

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
David E. Johnson, Judge

David B. Hargett (Hargett Law, PLC, on brief), for appellant.

Stephen L. Forster, Assistant Attorney General (Mark R. Herring,
Attorney General, on brief), for appellee.


On November 17, 2016, Dr. John Elmore Gibbs ("appellant") was convicted of felony

child neglect in violation of Code § 18.2-371.1(B).[1]  Appellant appeals the sufficiency of the

evidence for the conviction, arguing that the trial court "erred in convicting Gibbs when the

evidence failed to prove beyond a reasonable doubt criminal negligence, any 'willful act or

omission' that 'was so gross, wanton, and culpable as to show a reckless disregard for human

life,' or any knowledge or consciousness that the child likely would be seriously injured."

I. BACKGROUND

We consider the evidence on appeal "in the light most favorable to the Commonwealth,

as we must since it was the prevailing party" in the trial court.  Beasley v. Commonwealth, 60

---

\* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] Although neither the final conviction order nor the sentencing order specifies that
appellant's conviction is based on subsection B of Code § 18.2-371.1, the indictment recites the
language of Code § 18.2-371.1(B).

Va. App. 381, 391, 728 S.E.2d 499, 502 (2012) (quoting Riner v. Commonwealth, 268 Va. 296, 330, 601 S.E.2d 555, 574 (2004)). So viewed, the evidence at trial showed that on the afternoon of February 22, 2016, Gregory Gentry, the maintenance adviser at the Clairmont at Chesterfield Apartments, located in Chesterfield County, observed five-year-old J.G.[2] wandering alone around the outside of the apartment complex. Gentry described J.G. as "a little child, a little boy" wearing "no jacket, a T-shirt, some pants," and shoes without socks. Gentry testified that "[i]t was very cold. I had on a sweatshirt along with a jacket. It was cold. It was February."

Gentry attempted to talk to J.G.; however, the boy turned and ran from him. Gentry and his supervisor, Rebecca Cantowsky, followed the boy as he crossed the street from the apartment complex. Gentry explained, "He [J.G.] had crossed the street from our property onto the Costco side. So we were going up to traffic." By the time they caught up with him, J.G. was "[w]ell over 150 feet" from the apartment complex. He had crossed through the apartment's "privacy fence, through the gate, across the street, and was on the Costco side [of the street] up by the gas station area, where other pedestrians were pumping gas." During his exit from the complex, J.G. had also passed the apartment complex's gated pool and pond.

Gentry testified that, after he reached J.G., the boy told Gentry that his father, appellant, had instructed J.G. to meet him at the hospital. Gentry tried to persuade the boy to get into Cantowsky's car, but J.G. resisted and repeatedly told Gentry that appellant had told J.G. to meet him at the hospital. Gentry eventually persuaded J.G. to return to the apartment complex with him by allowing J.G. to ride on his shoulders. When Gentry asked J.G. his age, the boy claimed that he was thirteen. J.G. refused to tell Gentry his name.

After returning to the Clairmont Apartments, Gentry testified that he waited in his office with J.G. on his shoulders for 30 to 40 minutes. During this time, two Chesterfield County

---

[2] We use initials, instead of the child's name, in an attempt to better protect his privacy.

police officers arrived at the apartment complex and, with Cantowsky's assistance, they located the boy's apartment. When they reached the apartment, appellant approached the group. Gentry asked appellant if J.G. "belong[ed] to him," and appellant told the group that J.G. was his son. Gentry testified that he was upset by appellant's reaction to learning that his son had been wandering around outside alone. Gentry stated that appellant offered "[n]o thank you. No nothing. No look like a sigh, where did you find him, anything." Gentry testified that he told appellant that J.G. claimed he was thirteen years old, and appellant responded that "he [J.G.] is a liar." Gentry also testified that it was "[w]ell over forty minutes" between the time Gentry first saw J.G. and the time appellant arrived.

Cantowsky, Gentry's supervisor and the property manager for the Clairmont at Chesterfield Apartments, testified at appellant's trial and confirmed Gentry's account. She also testified that she recognized J.G. from a prior incident on the apartment complex's property where J.G. had been found alone at the apartment complex's pool.

Cantowsky testified that she called the police from her car while she and Gentry were following J.G. Cantowsky told the police where J.G. lived. She also testified that, when they arrived at appellant's apartment, they knocked on the door and then "stood there for a while and knocked, at least for a few minutes." Cantowsky testified that no one ever answered the door, but the group eventually saw appellant walking toward them from the front of the building.

Officer Saxer, one of the officers from the Chesterfield County Police Department, testified that, after the call came in on the day of the incident, he was actually dispatched at 4:10 p.m., and arrived at the apartment complex at 4:33 p.m. He testified that an additional 15 to 20 minutes elapsed before appellant appeared.

Officer Saxer testified that he explained to appellant that J.G. had left the apartment and that J.G. had said that he was on the way to the hospital to meet his father. Officer Saxer also

- 3 -

testified that appellant told him that J.G.'s explanation about the hospital "was a lie, he [appellant] didn't say anything like that." Appellant told Officer Saxer that J.G. was at home that day because J.G. had been suspended from school.

A school counselor at J.G.'s elementary school also testified as a witness for the Commonwealth. She stated that, at the time of the incident, J.G. was in kindergarten. On the afternoon that J.G. was found wandering, she had a meeting with appellant at 4:00 p.m. to discuss J.G.'s behavior, his current suspension from school, and how "to keep him safe and other kids safe at school." The counselor testified that the principal, assistant principal, and a special education teacher were also present at the meeting. She also testified that she believed J.G. had been suspended on other occasions that year and that he had "other office referrals." She stated that their meeting with appellant lasted about 30 minutes and that the drive from the elementary school to the Clairmont Apartments takes a "couple of minutes."

The Commonwealth's last witness was an investigator with Chesterfield County Child Protective Services (CPS). She testified that she had an interview with appellant on February 25, 2016, following a complaint made about appellant's treatment of J.G. During the interview, appellant told her that he had gone to J.G.'s school for a conference with J.G.'s teachers, and he had left J.G. home by himself at the apartment. Appellant told her that he believed J.G. was not allowed on school grounds. She also testified that appellant had told her about a prior incident that had occurred the month before when appellant had left J.G. at home with his older teenage brother. On that day in January, J.G. had left the apartment by himself and wandered to the apartment complex's community pool, where the apartment staff found him.

At some point following the incident now before us on appeal, the CPS investigator visited J.G. at school. She and a detective tried to speak with J.G. in a conference room, but the child ran from the room and through the school's halls, requiring "principals and several school

staff . . . to go after him." Eventually, the guidance counselor was able to calm J.G. down. The CPS investigator and the detective were able to speak with J.G., but, whenever they "started talking about who was in his family, who lived at home with him, he shut down."

Following the bench trial, appellant was convicted of felony child neglect in violation of Code § 18.2-371.1(B)(1). In finding appellant guilty of the offense, the trial court reasoned:

> The facts are Dr. Gibbs left his five-year-old son, a child with a history of unruly or undisciplined behavior, at home alone. Dr. Gibbs did not leave due to an emergency. He left to attend a prescheduled meeting. This act alone has the potential of endangering the child's life, even if he does not get out of the apartment. This act alone is subjecting [J.G.] to substantial risk of serious injury. The fact that he got out, and Mr. Gentry, under questioning from defendant's counsel, referred to a slash in the screen, and there was nothing else presented, raises more potential concern, but finally he does get out, which opens up an entire new realm of potential endangerment to his life.

This appeal followed.

## II. ANALYSIS

When considering the sufficiency of the evidence on appeal, "a reviewing court does not 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" Crowder v. Commonwealth, 41 Va. App. 658, 663, 588 S.E.2d 384, 387 (2003) (quoting Jackson v. Virginia, 443 U.S. 307, 318-19 (1979)). "We must instead ask whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Id. (quoting Kelly v. Commonwealth, 41 Va. App. 250, 257, 584 S.E.2d 444, 447 (2003) (*en banc*)). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Kelly, 41 Va. App. at 257-58, 584 S.E.2d at 447 (quoting Jackson, 443 U.S. at 319).

Code § 18.2-371.1(B)(1), provides:

> Any parent, guardian, or other person responsible for the care of a child under the age of 18 whose willful act or omission in the care of such child was so gross, wanton, and culpable as to show a reckless disregard for human life is guilty of a Class 6 felony.

To support a conviction under Code § 18.2-371.1(B)(1), the Commonwealth must prove that appellant "through [his] willful act or omission, showed a reckless disregard for [his] son's life." Jones v. Commonwealth, 272 Va. 692, 698, 636 S.E.2d 403, 406 (2006) (citing Barrett v. Commonwealth, 268 Va. 170, 183, 597 S.E.2d 104, 110-11 (2004)).

> The word [willful] often denotes an act which is intentional, or knowing, or voluntary, as distinguished from accidental. But when used in a criminal statute it generally means an act done with a bad purpose; without justifiable excuse; stubbornly, obstinately, perversely[.] The word is also employed to characterize a thing done without ground for believing it is lawful.

Barrett, 268 Va. at 183, 597 S.E.2d at 111 (quoting United States v. Murdock, 290 U.S. 389, 394 (1933)). "The term 'willful act' imports knowledge and consciousness that injury will result from the act done. The act done must be intended or it must involve a reckless disregard for the rights of another and will probably result in an injury." Id.

> The term "gross, wanton, and culpable" describes conduct. The word "gross" means "aggravated or increased negligence" while the word "culpable" means "deserving of blame or censure." Bell [v. Commonwealth, 170 Va. 597, 611, 195 S.E. 675, 681 (1938)]. "'Gross negligence' is culpable or criminal when accompanied by acts of commission or omission of a wanton or wilful nature, showing a reckless or indifferent disregard of the rights of others, under circumstances reasonably calculated to produce injury, or which make it not improbable that injury will be occasioned, and the offender knows, or is charged with the knowledge of, the probable result of his acts." Id. at 611-12, 195 S.E. at 681.

Barrett, 268 Va. at 183, 597 S.E.2d at 111 (quoting Cable v. Commonwealth, 243 Va. 236, 240, 415 S.E.2d 218, 220 (1992)).

Appellant argues that this Court's decision in Ellis v. Commonwealth, 29 Va. App. 548, 554, 513 S.E.2d 453, 456-57 (1999), requires that his conviction be overturned. In Ellis, Brenda Ann Ellis, had, at some point during the day, turned on the gas stove in her apartment in order to light a cigarette. Id. at 551, 513 S.E.2d at 455. She failed to turn off the stove, and later left her apartment to visit her friend in another apartment in that complex that the trial court found was approximately 30 to 50 yards from her building, leaving her two young children (ages two and four) alone napping in their bedroom. Id. at 552, 513 S.E.2d at 455. Ellis and her friend prepared food in her friend's microwave oven and then talked on the friend's front porch. Id. Ellis's apartment was nearby, but was not visible from the friend's porch. Id. Shortly after Ellis left her apartment, a fire broke out, resulting in injury to her children. Id.

The trial court found Ellis guilty of child neglect in violation of Code § 18.2-371.1 with respect to one child and cruelty to children in violation of Code § 40.1-103 with respect to the other child. Id. at 553, 513 S.E.2d at 456. In support of its ruling, the trial court found that the culpable "acts of the Defendant were leaving two children aged 27 months and four years nine months asleep in a closed apartment for a period of 15 to 30 minutes with a purpose of socializing with friends or neighbors some 30 to 50 yards away." Id.

Ellis appealed the Code § 18.2-371.1 conviction, "contending the evidence was insufficient to prove her actions constituted a 'willful' act or omission." Id. This Court agreed and reversed the conviction, holding that the evidence failed to show that Ellis acted willfully when she left her children unattended. Id. at 555, 513 S.E.2d at 456. The Court stated that, although appellant "purposefully and intentionally left her apartment" to visit a friend, "the intent which is relevant to our determination of 'bad purpose' does not relate simply to why she left the apartment. Rather, it relates to the degree to which she was aware of the danger when leaving her children unattended." Id. at 555, 513 S.E.2d at 457. In reviewing the record, this Court

found that "no evidence establishes that she [Ellis] left the apartment with the intent to injure her children; nor does the evidence support the conclusion that she acted with knowledge or consciousness that her children would be injured as a likely result of her departure to visit a neighbor for a short period of time in another residential building." Id. at 555, 513 S.E.2d at 457.

Contrary to appellant's argument, however, the present case is not controlled by Ellis because in Ellis, the evidence did not support the conclusion that Ellis acted with knowledge or consciousness that her children would likely be injured as a result of her visiting a neighbor a short distance away. Here, however, the evidence does support the conclusion that appellant acted with reckless disregard for the life and safety of his child in a way that would probably result in injury by leaving him alone in their apartment for the better part of an hour to drive away to a prescheduled meeting. Most significant of the several facts that should have alerted appellant to the likelihood that harm would occur to J.G. from leaving the child alone at the apartment is the fact that a similar situation occurred just a month earlier. On that day, J.G., who had been left home with his older brother, walked out of appellant's apartment, and the staff at the apartment complex found J.G. alone at the complex's pool in January. This prior incident should have alerted appellant to J.G.'s propensity to leave the apartment when not adequately supervised. In the earlier incident, he was not even alone in the apartment as he was this time. In addition, appellant should have been aware that J.G.'s young age, coupled with (as the trial court found) his "history of unruly or undisciplined behavior," rendered the child incapable of staying alone in the apartment unsupervised for close to an hour. The record shows that J.G. was demonstrating major behavioral problems at school. At the time of the incident, J.G. was suspended from school, and the actions that led to the suspension apparently required appellant and school staff to have a discussion about how "to keep him safe and other kids safe at school."

These facts demonstrate that appellant knew that leaving J.G. alone at home, unsupervised, would probably result in injury to the child. [3]

We agree with the Commonwealth that this Court's decision in Barnes v. Commonwealth, 47 Va. App. 105, 622 S.E.2d 278 (2005), is more persuasive to our decision in this case. In Barnes, Arteshia S. Barnes left her two children, ages two and four, sleeping alone at their apartment while she went to the store to shop for groceries. Id. at 109, 622 S.E.2d at 279-80. While she was gone, the children awakened, left the apartment, and knocked on the door of the neighbor's apartment. Id. at 109, 622 S.E.2d at 279. Suspecting that the children had been left alone, the neighbor called the police. Id. Shortly after the police arrived – approximately 50 minutes after the children first knocked on the neighbor's door – Barnes appeared carrying ten grocery bags. Id. at 109, 622 S.E.2d at 280. Barnes admitted to the police that she had left the children alone in order to go to the grocery store by herself. Id.

At trial, Barnes was convicted of child endangerment in violation of Code § 40.1-103(A).[4] The trial court noted that among the risks to the children's safety "was the

---

[3] The fact that J.G. was not actually injured is irrelevant to our analysis. Unlike Code § 18.2-371.1(A), Code § 18.2-371.1(B)(1), "does not require that a child actually suffer serious injury as a result of the defendant's acts or omissions." Commonwealth v. Duncan, 267 Va. 377, 385, 593 S.E.2d 210, 214 (2004). "The absence of an injury requirement in subsection (B)(1) reflects the lesser nature of the offense, a Class 6 felony, and demonstrates a legislative intent to prohibit conduct that also has the *potential* of endangering a child's life." Id. (emphasis added). See also White v. Commonwealth, 68 Va. App. 111, 115 n.2, 804 S.E.2d 317, 319 n.2 (2017) (noting that White's decision to leave "her young children alone at home while she took her husband to work was a significant fact in her convictions under Code § 18.2-371.1(B)" – which she did not appeal – but would not have established criminal liability under Code § 18.2-371.1(A) because no injury occurred to either of the children at that time).

[4] Although Barnes's conviction fell under Code § 40.1-103(A), our decision in that case is also persuasive for our determination of the type of behavior that constitutes criminal negligence punishable under Code § 18.2-371.1(B)(1) – the statute under which appellant was convicted. See Carosi v. Commonwealth, 280 Va. 545, 553, 701 S.E.2d 441, 445 (2010) ("Although the two statutes [Code § 40.1-103(A) and Code § 18.2-371.1(B)(1)] define separate offenses, it is clear that the *mens rea* for each offense can be satisfied by a showing of criminal negligence on the part of the defendant."). See also Mott v. Commonwealth, No. 1802-15-1,

foreseeable possibility that they would wake up, go outside looking for their mother, and be struck by a vehicle on Virginia Avenue." Id. On appeal, Barnes argued the evidence was insufficient to prove that she acted with criminal negligence. This Court disagreed and upheld the conviction because, given the circumstances of the case, a rational factfinder could have found Barnes "criminally negligent in leaving her 2 and 4-year-old children alone in an unlocked apartment while making herself inaccessible for a period of time long enough to travel to a grocery store, collect and check out 10 bags of groceries, and then drive back to her apartment." Id. at 111, 622 S.E.2d at 281. It was significant to the Court's decision that "[w]hen the children awoke, they had no idea where their mother was or where they should look for her." Id. Although the children sensibly sought the help of a neighbor, "they just as easily could have wandered out on Virginia Avenue into vehicular traffic, or gotten lost outside, or injured themselves in any number of ways that children of such a young age can." Id. at 111-12, 622 S.E.2d at 281.

In affirming Barnes's conviction, the Court explained:

> Given the fact-intensive nature of the inquiry, the sufficiency analysis on appeal depends entirely on the specific circumstances of each case: the gravity and character of the possible risks of harm; the degree of accessibility of the parent; the length of time of the abandonment; the age and maturity of the children; the protective measures, if any, taken by the parent; and any other circumstance that would inform the factfinder on the question whether the defendant's conduct was criminally negligent.

Id. at 113, 622 S.E.2d at 282.

---

2016 Va. App. LEXIS 325, at *4-5 (Va. Ct. App. Nov. 29, 2016) (affirming felony child neglect convictions under Code § 18.2-371.1(B)(1) based on the factors articulated in Barnes). The two statutes, both Class 6 felonies, "are sufficiently similar that the legislature has included identical provisions for an affirmative defense to each offense where the prosecution is 'based solely on the accused parent having left the child at a hospital or rescue squad . . . within the first 14 days of the child's life.'" Carosi, 280 Va. at 553 n.4, 701 S.E.2d at 445 n.4 (citing Code § 18.2-371.1(B)(2) and Code § 40.1-103(B)).

Considering each of the six factors described in Barnes, we cannot say that, under these specific circumstances in this case, a rational factfinder could not find appellant guilty of felony child neglect beyond a reasonable doubt. A review of those factors shows why the trial court was not plainly wrong in finding that "Dr. Gibbs took a willful act in the care of [J.G.] that was so gross, wanton and culpable [as] to show a reckless disregard for human life." The first factor – the gravity and the character of the possible harm – is similar to that faced by the children in Barnes. As in Barnes, the potential harm in this case was the harm that would occur from the child, J.G., being left alone in the apartment without supervision for close to an hour. More specifically, the risk was the harm that was likely to occur when J.G. left the apartment alone and ventured across the street, as he actually did in this case, to the parking lot of the Costco and gas station.

With respect to the second factor – the degree of accessibility of the parent – the record shows that appellant made himself completely inaccessible to J.G. Although the school was only minutes away by car, it required appellant to drive away from his apartment building, preventing him from seeing or hearing J.G. if the child needed assistance. In Barnes, this Court found Barnes's inaccessibility to be a substantial factor that distinguished Barnes from Ellis. While Ellis was not far away at a neighbor's apartment and could have potentially been easily located by her children – or a neighbor if the neighbor saw her children in distress, "Barnes absented herself entirely from her children, her neighbors, and anyone else who might find the children wandering outside." Id. at 112, 622 S.E.2d at 281. Similarly, appellant's choice to completely absent himself from the entire premises of the apartment complex distinguishes the present case from Ellis. Furthermore, also similar to the children in Barnes, who awoke with no idea where their mother was located, J.G. appeared to have no idea that appellant was at his school. J.G.

apparently believed that appellant was working at the hospital and that he was supposed to meet him there.

As to the third factor – the length of time of the abandonment – appellant was absent for about the same amount of time as the mother in Barnes. Although there is no hard and fast rule regarding how long a child may be left alone before a parent may become criminally negligent, as the analysis depends on the specific facts of the case, we note that appellant left J.G. alone for a period of time longer than in cases where this Court held that the evidence was insufficient to support a conviction. See Hannon v. Commonwealth, 68 Va. App. 87, 91, 803 S.E.2d 355, 357 (2017) (evidence insufficient to convict appellant under Code 18.2-371.1(B)(1) where appellant left two children, a five-year-old boy and a four-month-old girl, alone in an unlocked car for less than fifteen minutes in the parking lot in front of a Dollar General Store while she was shopping in the store).

The trial court found that J.G.'s age and immaturity – the fourth factor the Court in Barnes considered – weighed in favor of the conviction. The trial court found that J.G. had a "history of unruly or undisciplined behavior," and this finding is supported by the evidence. J.G. was suspended from school at the time of the incident, and his behavior at school had necessitated a meeting between appellant and school officials in order, as the school counselor put it, "to keep him safe and other kids safe at school." J.G. had also apparently been suspended by the school before, and he was only in kindergarten. Furthermore, J.G. had left the apartment by himself just a month before and wandered away to the pool when appellant had left him at home with his older teenage brother. On the whole, the evidence presented at trial and the findings of the trial court show that appellant should have known that J.G., an immature, apparently unruly, five year old, was not mature enough to remain alone at his apartment for the better part of an hour.

The record contains little evidence that would have allowed the trial court to infer facts relevant to the fifth Barnes factor — i.e., that appellant took any protective measures to keep J.G. safe and secure when he left the apartment. Instead, the trial court's findings highlight appellant's failure to take any protective measures. The trial court found that the fact that appellant left J.G. to attend a prescheduled meeting – as opposed to leaving to address an emergency situation – supported the conviction. Because the meeting was prescheduled, appellant had the opportunity to arrange for other care for J.G. or to change the time of the meeting to ensure J.G. would be supervised and cared for before he left for the meeting – or to take J.G. with him if he had no other alternative. However, the record contains no facts suggesting that appellant attempted to arrange for any alternative care for J.G.

The final factor, which requires us to consider "any other circumstance that would inform the factfinder on the question whether the defendant's conduct was criminally negligent," strongly supports appellant's conviction. In this case, appellant was aware that, just a month prior to the incident at issue, a virtually identical situation had occurred. What happened then should certainly have alerted appellant to the likelihood that J.G. would leave the apartment and be injured if he left the child alone in their apartment, given that J.G. had already wandered off alone from the apartment when he was left there with his older teenage sibling. Based on the totality of the circumstances (and our application of the factors in Barnes), we certainly cannot say that no rational factfinder would have convicted appellant.

### III. CONCLUSION

We certainly create no *per se* rule that a parent who leaves a five-year-old child at home by himself will be guilty of felony child neglect. See e.g., Hannon, 68 Va. App. at 92, 803 S.E.2d at 357.

> The General Assembly expressly has recognized the fundamental
> nature of the parent child relationship. Code § 1-240.1 provides that

> "[a] parent has a fundamental right to make decisions concerning the upbringing, education, and care of the parent's child." Thus, although there are varied opinions about what constitutes "good parenting" and the appropriate level of parental supervision, parents are afforded a great deal of latitude regarding the care of their children.

Id. at 92-93, 803 S.E.2d at 358.

Circumstances – and children themselves – can be quite different. A parent has a right to decide, within reason, when and for how long, a child is sufficiently mature to be left alone at home. "This latitude, however, is not without bounds. The Commonwealth has a legitimate interest in preserving the physical safety of children." Id. at 93, 803 S.E.2d at 358 (citing Knox v. Lynchburg Div. of Soc. Servs., 223 Va. 213, 223, 288 S.E.2d 399, 404 (1982)). "Clearly, the protection of children from harm, whether moral, emotional, mental, or physical, is a valid and compelling state interest." Knox, 223 Va. at 223, 288 S.E.2d at 404 (citing Stanley v. Illinois, 405 U.S. 645, 652 (1972)). "Accordingly, the General Assembly can (and has) criminalized certain actions or inaction by parents, guardians or other custodians that either cause harm to children or place children in situations where harm is likely to occur." Hannon, 68 Va. App. at 93, 803 S.E.2d at 358.

Based on the specific facts and circumstances of this particular case, "each mounting upon the others," Ervin v. Commonwealth, 57 Va. App. 495, 505, 704 S.E.2d 135, 140 (2011) (en banc), we affirm appellant's conviction. The record establishes that appellant should have known that five-year-old J.G. was insufficiently mature to be left alone in their apartment for the better part of an hour, while appellant attended a prescheduled meeting, and that leaving him as appellant did here showed "a reckless disregard" for J.G.'s life and safety and created circumstances that would "probably result in an injury" to him. See Barrett, 268 Va. at 183, 597 S.E.2d at 111. Appellant was aware of his child's significant "history of unruly or undisciplined behavior," his immaturity, and his impulsiveness as evidenced by J.G.'s actions at school – in addition to this kindergartener's young age. Significantly, appellant's meeting with school officials was to discuss their concern that

J.G.'s behavior was such that J.G. and school officials could not keep him or others safe at school when J.G. was there.

Most of all, appellant was specifically aware of J.G's propensity to leave the apartment – which was surrounded by a pool, a pond, and a street that bordered commercial businesses, including a Costco store and gas station – when not properly supervised. Appellant knew that, just a month before, his child had left the apartment and was found wandering around the complex's pool by himself when he had been left at home with his older teenage brother. Despite having this knowledge of all of the circumstances, appellant chose to make himself completely inaccessible to his child by leaving J.G. alone in their apartment (apparently without even telling J.G. where he was going) in order to attend a prescheduled meeting. Moreover, appellant's apparent lack of concern that J.G. had left the home, traveled across a road, and was not dressed for the weather indicates appellant's "reckless disregard" for J.G.'s life and safety, and appellant's actions here created circumstances that would "probably result in an injury" to him. See Barrett, 268 Va. at 183, 597 S.E.2d at 111. Gentry testified that appellant showed no concern for the danger to which J.G. had been exposed. Appellant did not ask where the child had been found or thank the people who had ensured the child's safety. Appellant was concerned only with impugning J.G. as a liar.

For all of these reasons, we certainly cannot conclude that *no* rational factfinder would have found appellant guilty of Code § 18.2-371.1(B). Therefore, we affirm appellant's conviction.

Affirmed.