Present:  Hassell, C.J., Lacy, Keenan, Koontz, Kinser, and
Lemons, JJ., and Carrico, S.J.

AMY JEAN BARRETT, A/K/A
AMY JEAN CLARK
                                          OPINION BY
v.  Record No. 032252          SENIOR JUSTICE HARRY L. CARRICO

                                      June 10, 2004
COMMONWEALTH OF VIRGINIA


              FROM THE COURT OF APPEALS OF VIRGINIA


     In a jury trial held in the Circuit Court of York County,

Amy Jean Barrett (Barrett)[1] was convicted pursuant to Code

§ 18.2-371.1(A) of a Class 4 felony for the criminal neglect

of her ten-month-old son, Joshua, resulting in his death.  She

was sentenced to serve two years in the penitentiary and

ordered to pay a fine of $1,000.00.  Barrett was also

convicted pursuant to former Code § 18.2-371.1(B)[2] of a Class 6

felony for the criminal neglect of her daughter, Patricia,

aged two years and ten months.  Barrett was assessed a fine of

$2,500.00 for this conviction.[3]

---

[1] Apparently, Barrett married and became Amy Jean Clark at
some time during these proceedings, but she was indicted under
the name of Barrett and we will refer to her by that name.

[2] Code § 18.2-371.1(B) was amended in 2003. Paragraph B of
the former statute, under which Barrett was indicted, is now
set forth in identical language as paragraph (B)(1) in the
amended statute.  We will use the current numbering in this
opinion.

[3] Barrett was also charged with involuntary manslaughter
in the death of Joshua, but the jury found her not guilty of
that charge.

In a published opinion, the Court of Appeals affirmed both convictions. Barrett (Clark) v. Commonwealth, 41 Va. App. 377, 585 S.E.2d 355 (2003). We awarded Barrett this appeal to consider the two questions presented by her assignments of error, (1) whether the trial court erred in refusing to quash the indictment for Barrett's neglect of Patricia on the ground the indictment was the result of prosecutorial vindictiveness, and (2) whether the trial court erred in finding the evidence sufficient to support Barrett's convictions.

MOTION TO QUASH

Background

With respect to the death of Joshua, Barrett was indicted on September 15, 1998, for felony child neglect under Code § 18.2-371.1(A) and for felony murder under Code § 18.2-33. In a jury trial held in February 1999, Barrett was convicted of both offenses. However, on June 27, 2000, the Court of Appeals of Virginia reversed the convictions. Barrett v. Commonwealth, 32 Va. App. 693, 530 S.E.2d 437 (2000). The court held that, although the evidence was sufficient to support the conviction for felony child neglect under Code § 18.2-371.1(A), the trial court erred in refusing to instruct the jury on the meaning of the term "willful," as used in that Code section. 32 Va. App. at 699, 530 S.E.2d at 440. The court also held that the evidence was insufficient to sustain

2

the felony murder conviction. The case was remanded for further proceedings, "if the Commonwealth be so advised." Id. at 701, 530 S.E.2d at 441.

When the case returned to the trial court, the Commonwealth moved to amend the charge for the felony murder of Joshua to a charge of involuntary manslaughter. On April 3, 2001, without objection from Barrett, the trial court entered an order directing the amendment.

During plea negotiations that followed, the Commonwealth informed Barrett that it intended to proceed with a trial on both charges involving Joshua, i.e., manslaughter and felony child neglect under Code § 18.2-371.1(A). The Commonwealth also told Barrett that, if she refused to plead guilty to those charges, it would seek an indictment for felony child neglect of Patricia under Code § 18.2-371.1(B)(1). The plea negotiations failed, Barrett did not plead guilty, and, on May 22, 2001, the Commonwealth sought and received an indictment charging Barrett with felony child neglect of Patricia.

Barrett then filed a motion to quash the new indictment. In a hearing on the motion, Barrett asserted that the Commonwealth was pursuing the new charge as "punishment to [her] for having . . . successfully appealed her initial charges." She argued that the Commonwealth had the opportunity to bring the charge involving Patricia prior to trial on the initial charges yet waited for almost eleven

3

months after the Court of Appeals had remanded the case, that the new indictment was based upon the same "facts and incidents" presented at the first trial, and that the new charge "carries a potential additional sentence to which [Barrett was] being subjected." All this, Barrett maintained, raised a presumption of prosecutorial vindictiveness or created "the appearance of vindictiveness," resulting in a violation of her Fifth Amendment right of due process. Thus, Barrett concluded, the trial court should quash the new indictment "based on prosecutorial vindictiveness or the appearance of vindictiveness." Finding "no presumption of vindictiveness, nor . . . any actual vindictiveness," the trial court denied Barrett's motion to quash.

## Discussion

On appeal, Barrett repeats her argument that her due process rights "were violated because the Commonwealth was permitted to bring a new indictment based on the same facts, transaction, or occurrence" and, hence, that she "is being punished for exercising her right to appeal the first set of convictions."[4] She states that the issue in this case "seems to be a matter of first impression for this Court as no appellate decision has opined whether the Commonwealth can

---

[4] Barrett does not claim that her prosecution for the neglect of Patricia constituted double jeopardy but relies solely on her assertion that the prosecution was vindictive and thus violative of her right of due process.

4

indict a defendant on a wholly new charge following a successful appeal."

Barrett cites three decisions of the Supreme Court of the United States on the subject at hand:  North Carolina v. Pearce, 395 U.S. 711 (1969); Blackledge v. Perry, 417 U.S. 21 (1974); and United States v. Goodwin, 457 U.S. 368 (1982).

In Pearce, a defendant was originally convicted of assault with intent to commit rape and sentenced to serve eight to ten years.  His conviction was reversed on appeal, and, upon retrial of the rape charge, the defendant was convicted and sentenced to a term of twelve to fifteen years, which, when added to the time he had already spent in prison, amounted to a longer sentence than originally imposed.

In a federal habeas corpus proceeding, the district court held that the longer sentence imposed upon retrial was unconstitutional and void.  The United States Court of Appeals for the Fourth Circuit affirmed the district court's holding. The Supreme Court affirmed the Fourth Circuit, stating that the "imposition of a penalty upon the defendant for having successfully pursued a statutory right of appeal or collateral remedy would be . . . a violation of due process of law."  395 U.S. at 724.

In Perry, the defendant was charged in a state district court with the misdemeanor of assault with a deadly weapon. Upon conviction, for which he received a six-month sentence,

he appealed to the superior court, where he had the right to a trial *de novo*.  While the appeal was pending, the prosecutor obtained an indictment charging a felony for the same conduct, to which the defendant plead guilty and for which he was sentenced to a term of five to seven years.

In a federal habeas corpus proceeding, the district court granted the defendant a writ, and the United States Court of Appeals for the Fourth Circuit affirmed.  In affirming the Fourth Circuit, the Supreme Court stated that "[a] person convicted of an offense is entitled to pursue his statutory right to a trial *de novo*, without apprehension that the State will retaliate by substituting a more serious charge for the original one, thus subjecting him to a significantly increased potential period of incarceration."  417 U.S. at 28.

In Goodwin, the defendant was originally charged in federal district court with several misdemeanors, including assault of a police officer.  He expressed an interest in plea bargaining but decided not to plead guilty and requested a trial by jury.  Then, while those charges were still pending, he was indicted and thereafter convicted by the district court on a felony charge of forcibly assaulting a police officer arising out of the same incident.  The court denied the defendant's motion to set the verdict aside on the ground of prosecutorial vindictiveness.  The United States Court of

6

Appeals for the Fourth Circuit reversed, finding a legal presumption of prosecutorial vindictiveness.

Although Barrett cites Goodwin as though it supports her argument, she does not tell us that the Supreme Court, while saluting the rule that "[t]o punish a person because he has done what the law plainly allows him to do is a due process violation," 457 U.S. at 372, actually reversed the Fourth Circuit. The Supreme Court held that a presumption of prosecutorial vindictiveness was not warranted, id. at 382, and that "[a]bsent a presumption of vindictiveness, no due process violation has been established," id. at 384. The Supreme Court also stated that

> the mere fact that a defendant refuses to plead guilty and forces the government to prove its case is insufficient to warrant a presumption that subsequent changes in the charging decision are unjustified.

457 U.S. at 382-83. Goodwin, therefore, actually supports the Commonwealth's position; it certainly does not require the finding of a presumption of vindictiveness in Barrett's favor.

Barrett also cites three decisions by Circuit Courts of Appeals: United States v. Fiel, 35 F.3d 997 (4th Cir. 1994) cert. denied, 513 U.S. 1177 (1995); United States v. Williams, 47 F.3d 658 (4th Cir. 1995); and United States v. Whaley, 830 F.2d 1469 (7th Cir. 1987), cert. denied, 486 U.S. 1009 (1988). Again, Barrett cites these cases as though they support her argument and, again, she does not tell us the outcome of the

7

cases. However, while all three of the cases involved prosecutions for offenses more serious than originally charged, in not one did the court apply a presumption of vindictiveness.[5] So the cases do not support the finding of a presumption of vindictiveness in Barrett's favor. To the contrary, the cases support the Commonwealth's position.

Hence, in only two of the cases cited above, Pearce and Perry, was a presumption of vindictiveness applied, and they are clearly distinguishable from the present case. In Pearce and Perry, the enhanced charge or punishment was directly related to the reversal on appeal of the initial charge. Here, there is no such relationship. The harsher punishment imposed in this case resulted not from the reversal on appeal of the offense involving Joshua, but from a trial for a separate offense, separate because it involved a different victim in the person of Patricia. It is merely coincidental, therefore, that the facts other than the identity of the victim might provide proof of Barrett's neglect of both Joshua and Patricia. And it is immaterial that the offense against Patricia could have been initiated at an earlier time. As the Court of Appeals stated in its written opinion in this case:

> We note at the outset that "[i]t is well established that the choice of offenses for which a criminal defendant will be charged is within the discretion of the Commonwealth's Attorney." Kauffmann v. Commonwealth, 8

---

[5] Nor did any of the courts make a finding of actual vindictiveness.

> Va. App. 400, 410, 382 S.E.2d 279, 284 (1989). Indeed, "the institution of criminal charges, as well as their order and timing, are matters of prosecutorial discretion." Bradshaw v. Commonwealth, 228 Va. 484, 492, 323 S.E.2d 567, 572 (1984).

41 Va. App. at 391, 585 S.E.2d at 362.

Here, Barrett, as did the defendant in Goodwin, declined to plead guilty to the original charges after plea negotiations failed and put the Commonwealth to proof of its case. What was said in Goodwin bears repeating here:

> [T]he mere fact that a defendant refuses to plead guilty and forces the government to prove its case is insufficient to warrant a presumption that subsequent changes in the charging decision are unjustified.

457 U.S. at 382-83.

Under the circumstances of this case, we are of opinion that a presumption of vindictiveness is not warranted. And, as in Goodwin, "[a]bsent a presumption of vindictiveness, no due process violation has been established." 457 U.S. at 384.

In such absence, the burden was upon Barrett to establish actual vindictiveness, and we conclude that she failed to carry her burden. All Barrett offered in her attempt to show actual vindictiveness were allegedly contradictory statements made by the Commonwealth during argument on Barrett's motion to dismiss.

In responding to Barrett's argument that the charge involving the neglect of Patricia should have been pursued during the first trial, Leslie A. Siman-Tov, an Assistant

9

Commonwealth's Attorney, said the prosecution was "focusing so much on the felony homicide and neglect of Joshua" that it failed to consider "there should have been another charge for neglect of Patricia."  Ms. Siman-Tov also said it was not until the prosecution reviewed the Court of Appeals' opinion reversing Barrett's initial convictions that it was realized Barrett should also have been charged with the neglect of Patricia.

Then, when the Commonwealth's Attorney, Eileen M. Addison, joined the argument, she stated that two or three weeks prior to the initial trial "there was some discussion with defense counsel at that time about the possibility of this other charge of neglect of Patricia" but that Ms. Siman-Tov was not "involved in that conversation."  Ms. Addison also said that the neglect of Patricia "was not charged at that time because there was no time to add an additional charge between the time that we thought of it and the time that [the initial charge] was set for trial."

Barrett says she "pointed out [in her argument below] that the prosecutors contradicted themselves by first claiming they did not think about the charge [involving Patricia] and then claiming that they ran out of time to get the indictment."  However, if this indeed constitutes a contradiction, it is of such trifling importance that it does not deserve further comment beyond stating that it does not

10

support a finding of actual vindictiveness or an abuse of discretion on the part of the prosecutor.

Accordingly, we conclude that the trial court did not err in denying Barrett's motion to quash the indictment charging the neglect of Patricia.

## SUFFICIENCY OF THE EVIDENCE

### Background

In accordance with familiar principles, we will state the evidence and all reasonable inferences fairly deducible therefrom in the light most favorable to the Commonwealth, the prevailing party at trial. Jackson v. Commonwealth, 267 Va. 178, 204, 590 S.E.2d 520, 535 (2004). And we will affirm the judgment of the trial court unless plainly wrong or without evidence to support it. Id.

The evidence shows that on April 17, 1998, Barrett and her two children were living with her boyfriend, Craig Griffith, in his apartment in York County. After Barrett put the children to bed that evening, she "went out," leaving the children in Griffith's care, which she did three or four times each month. She arrived at a local bar at 8:00 or 8:30 p.m. and had three beers during the course of the evening. She stayed at the bar until about 3:30 a.m. and then went to the home of the bartender, where she had one or two more beers.

The next morning, Griffith woke up about 5:00 a.m. and found that Barrett had not yet returned home. Griffith took a

11

shower preparatory to going to work.  He turned off the water when he finished his shower, but, because of an ongoing problem with the plumbing, approximately two to three inches of water remained in the tub.  Usually, the water drained out in five to ten minutes but "[s]ometimes it could be worse than others."

Barrett returned home about 6:00 a.m.  Griffith "wasn't happy" with her, and he left immediately for work.  He returned home about noon and, upon entering the apartment, found "[i]t was a wreck . . . [it] was just tore up." Patricia was "standing there with make-up on and no clothes." The TV was on but "playing static."  Barrett was asleep on the couch and did not wake up when Griffith came in.

Griffith asked Patricia where Joshua was.  She said "[h]e's in there," pointing to the entryway leading to the bedrooms and the bathroom.  Joshua was not in either bedroom, so Griffith went into the bathroom and saw "a blanket over the top of the bathtub."  When he removed the blanket, he saw in the tub a "lot of junk, toys, food, [and] a laundry basket upside down."  He picked up the laundry basket and found Joshua underneath it.  He picked Joshua up and saw that he was blue and cold.  He found that cold water was running into the bathtub, and "potato chips were clogging the drain."  Griffith tried to turn the water off but was unsuccessful, the faucet "just kept on spinning around."

Griffith picked Joshua up and "screamed for [Barrett],"
saying "she had killed her kid." She awoke and called "911."
An ambulance arrived and transported Joshua to a hospital,
where he was pronounced dead. An autopsy disclosed that
drowning was the cause of death. The autopsy also revealed
there were thirteen fresh bruises on Joshua's forehead and the
"top sides of his head."

The blanket Griffith found in the bathtub came from his
bed and the laundry basket came from the bedroom occupied by
Barrett and Griffith. The toys that were found in the bathtub
were usually kept in Patricia's room.

Griffith testified that, approximately three months
before the tragic events of April 17-18, 1998, Joshua's crib
was moved into the bedroom occupied by Griffith and Barrett
because Patricia had put "toys and stuff" on top of Joshua.
Griffith testified further that Patricia was jealous of Joshua
and that he, Griffith, had observed her covering Joshua with a
blanket on one occasion and pushing him down in several other
instances, that Barrett was present when this occurred, and
that he had warned her more than once she "needed to keep her
eye on them."

Jane M. Steele, an emergency room nurse who was present
when a doctor told Barrett Joshua had died, testified that
Barrett was "upset and crying [and] blamed a sibling, another
child," meaning Patricia, for Joshua's death but then "turned

13

and just blamed herself." Nurse Steele said that Patricia was present at the time, that Barrett was "very harsh toward the child," and that Barrett told Patricia, "you killed him."

Sergeant William Fordham of the Poquoson Police Department testified that he arrived at the hospital after Joshua was pronounced dead and asked Barrett for a statement. Barrett told him she was taking a nap on the couch about 11:00 or 11:30 on the morning in question and had placed Joshua on the floor next to the couch and given him a bottle. Patricia was asleep in her room. Barrett said there was something wrong with Patricia, that she constantly abused Joshua, tying scarves around his neck, pulling him around the apartment, and slamming her bedroom door in his face when he tried to crawl into the room. Barrett stated that Patricia had "tried in the past" to kill Joshua "but today she had been successful." Barrett told Fordham "she didn't want to even look at or be in the same room with Patricia."

Fordham was also present when Barrett was interviewed by two social service workers on the day Joshua died. Barrett said her son was "f----- dead and [Patricia] killed him." Then Barrett said: "It's my fault. I shouldn't have taken a nap."

The Commonwealth also introduced into evidence a videotape that was made of an interview of Barrett by a social service worker about five days after Joshua's death. Barrett

said Patricia was jealous of Joshua from the beginning; on the day she brought Joshua home from the hospital after his birth, Patricia, out of jealousy, threw toys on top of him in his crib. Barrett attributed much of the bruising found on Joshua's head in the autopsy to Patricia, including an occasion when she hit him in the head with a broom for no reason.

Barrett said the bathtub was Patricia's favorite place to play and she allowed her to sit in the tub with her toys as long as 45 minutes at a time; Patricia knew how to turn on the water and would turn it on to indicate she wanted to take a bath. Barrett agreed she could hear water running from the other parts of the apartment.

Barrett admitted that, shortly before Joshua's death, she had left Patricia unattended in the bathtub and that Patricia had pulled Joshua into the tub head first. This terrified Barrett. When asked whether Patricia could lift Joshua, Barrett said she definitely could, she had seen Patricia lift Joshua.

Barrett acknowledged to the social service worker that she had gone out the night before Joshua's death and had drunk about a six-pack of beer. She said she was not completely intoxicated but conceded that she could have been arrested for driving under the influence had she been stopped by the police on the way home. She said that she was extremely tired when

15

she got home, that she still had alcohol in her system that morning, and that she had taken some sinus medication, although it was the non-drowsy kind.

After Barrett returned home, she gave Joshua a bottle and sat him on the floor next to the couch. She sent Patricia to her room, although it was well before Patricia's nap time. Barrett then went to sleep on the couch. She did not hear water running in the bathroom and did not wake up until she heard Griffith's screams. She conceded that she had failed to supervise the children that morning. She said that she had to be sleeping quite soundly and that, had she not fallen asleep, Joshua would still be alive.

At the conclusion of the Commonwealth's case in chief, Barrett made a motion to strike the evidence. In argument on the motion, Barrett stated that foreseeability was "really the crux of this case" and that the Commonwealth had "not put on evidence that is sufficient to indicate that Mrs. Barrett could have or should have anticipated the probable result of Joshua drowning in a tub." Barrett also argued that the level of negligence the Commonwealth must prove was "not simple negligence" or "even what's called gross negligence," but, rather, "a merciless or inhumane disregard or an arrogant recklessness toward the rights or feelings of others."

The trial court denied the motion to strike. Barrett then rested her case and renewed the motion. The trial court

16

denied the renewed motion, stating that "[i]t's a question of fact for the jury."

## Discussion

Code § 18.2-371.1(A),[6] under which Barrett was indicted for the neglect of Joshua, proscribes a "willful act or omission or refusal to provide any necessary care for [a] child's health."  Code § 18.2-371.1(B)(1),[7] under which Barrett was prosecuted for the neglect of Patricia, proscribes a "willful act or omission in the care" of a child that is "so gross, wanton and culpable as to show a reckless disregard for human life."

> The word [willful] often denotes an act which is intentional, or knowing, or voluntary, as distinguished from accidental. But when used in a criminal statute it generally means an act done with a bad purpose; without justifiable excuse; stubbornly, obstinately, perversely[.]  The word is also employed to characterize a thing done without ground for believing it is lawful.

United States v. Murdock, 290 U.S. 389, 394 (1933) (citations omitted).  The term "willful act" imports knowledge and

---

[6] Code § 18.2-371.1(A) provides in pertinent part as follows:
A. Any parent, guardian, or other person responsible for the care of a child under the age of 18 who by willful act or omission or refusal to provide any necessary care for the child's health causes or permits serious injury to the life or health of such child shall be guilty of a Class 4 felony.

[7] Code § 18.2-371.1(B)(1) provides as follows:
B. Any parent, guardian, or other person responsible for the care of a child under the age of 18 whose willful act or omission in the care of such child was so gross, wanton and culpable as to show a reckless disregard for human life shall be guilty of a Class 6 felony.

17

consciousness that injury will result from the act done.  The act done must be intended or it must involve a reckless disregard for the rights of another and will probably result in an injury.

> [T]he term "gross, wanton, and culpable" describes conduct.  The word "gross" means "aggravated or increased negligence" while the word "culpable" means "deserving of blame or censure."  Bell [v. Commonwealth, 170 Va. 597, 611, 195 S.E. 675, 681 (1938)].  " 'Gross negligence' is culpable or criminal when accompanied by acts of commission or omission of a wanton or wilful nature, showing a reckless or indifferent disregard of the rights of others, under circumstances reasonably calculated to produce injury, or which make it not improbable that injury will be occasioned, and the offender knows, or is charged with the knowledge of, the probable result of his acts."  Id. at 611-12, 195 S.E. at 681.

Cable v. Commonwealth, 243 Va. 236, 240, 415 S.E.2d 218, 220 (1992).

Barrett argues that the evidence, viewed in the light most favorable to the Commonwealth, "only shows ordinary negligence, at best, and does not show a reckless disregard for Patricia's life."  Barrett says that when she fell asleep, "the atmosphere was peaceful and serene, Patricia was in her room playing, and Joshua was drinking a bottle while sitting on the floor next to [Barrett]."  Under these circumstances, Barrett asserts, her "act of falling asleep cannot support, as a matter of law, a conviction for felony neglect because there was no evidence of intent with a bad purpose."

Barrett also argues that "[t]he evidence failed to prove, beyond a reasonable doubt, that [Barrett] could reasonably

foresee that her daughter would somehow cause the death of her son in a tub which was holding about two inches of water." Barrett concludes that "[w]hile [her] falling asleep was not without remorse and blame, it does not rise to the level of a willful act or omission committed with a bad intent, a bad purpose, or a conscious disregard for human life."

We disagree with Barrett. She would have us focus on her "act of falling asleep" in a vacuum when it must be viewed in light of all the circumstances preceding and surrounding the tragic events of April 17-18, 1998. When so viewed, the circumstances show beyond all reasonable doubt that Barrett was guilty of more than the "ordinary negligence" she concedes she was guilty of. She was fully aware of Patricia's propensity for attempting to injure Joshua but recklessly disregarded those warning symptoms in neglect of her duty to protect both children. Coupling this with the evidence of her conduct on her "night out" and her resulting condition the next morning, she created a situation "reasonably calculated to produce injury, or which [made] it not improbable that injury [would] be occasioned, and [she knew], or [was] charged with the knowledge of, the probable results of [her] acts." Cable, 243 Va. at 240, 415 S.E.2d at 220.

Barrett knew from "the beginning" that Patricia was jealous of Joshua and that Patricia constantly abused him, covering him with a blanket, pushing him down, throwing toys

19

on top of him in his crib, tying scarves around his neck, pulling him around the apartment, slamming Barrett's bedroom door in his face when he tried to crawl into the room, and hitting him in the head with a broom. Barrett said that Patricia had tried in the past to kill Joshua, and, upon learning Joshua was dead, Barrett immediately said Patricia intentionally killed him.

Barrett also knew that the bathtub was Patricia's favorite place to play, and she allowed Patricia to sit in the tub with her toys for extended periods of time. Barrett knew that Patricia could turn on the water, and Barrett acknowledged that she could hear water running in the bathroom from other parts of the home.

Furthermore, and of the utmost significance, Barrett admitted that, shortly before Joshua's death, she had left Patricia unattended in the bathtub and Patricia had pulled Joshua into the tub head first. Barrett had seen Patricia lift Joshua before, and this should have forewarned Barrett that Patricia could get into the tub by herself and pull Joshua in after her.

Yet, Barrett "went out" drinking beer the evening before the tragic incident and spent the entire night away from home, even remaining away and drinking beer after the beer parlor had closed. She drank enough by her own admission to justify

her arrest for driving under the influence had she been stopped by the police on her way home the next morning.

Barrett sent Patricia to her room even though it was well before nap time, gave Joshua a bottle and placed him on the floor beside the couch, and then, still intoxicated as well as tired, proceeded to go to sleep on the couch, knowing she was the only one left in the apartment to supervise the children. From this, the jury could have concluded that Barrett's conduct was willful and accompanied by acts of omission of a wanton nature showing a reckless or indifferent disregard of the life and health of both children.

Barrett argues, however, that "Patricia was never in danger; there was no foreseeable risk of harm to Patricia [and no] evidence demonstrated any known or suspected danger based on any previous events or any other evidence which would even suggest that injury to Patricia was a likely result of [Barrett's] action or inaction. In fact, Patricia was not injured, nor was she in jeopardy of being injured." Barrett also argues that "the evidence failed to prove, beyond a reasonable doubt, that [she] could reasonably foresee that her daughter would somehow cause the death of Joshua in a tub which was holding about two inches of water."

This represents a very narrow view of the evidence. What we have here is the story of a disaster just waiting to happen, a disaster any reasonable person would consider likely

to result in injury to Patricia herself or to Joshua, or both. Barrett owed a duty to Joshua to protect him from injury by Patricia and a duty to Patricia to prevent her from injuring Joshua or being injured herself. Yet, Barrett failed miserably in her duty. Indeed, Barrett admitted "a lack of supervision" over the children on the occasion in question.

Barrett is correct in saying Patricia was not injured but incorrect in saying she was not in jeopardy of being injured. Code § 18.2-371.1(B)(1) does not require a showing of actual injury or death. "[S]ubsection (B)(1) does not limit the prohibited conduct to acts and omissions that subject a child to an actual risk of death, but proscribes conduct that is so 'gross, wanton and culpable' as to demonstrate a 'reckless disregard' for the child's life." Commonwealth v. Duncan, 267 Va. 377, 385, 593 S.E.2d 210, 215 (2004). And "such 'reckless disregard' can be shown by conduct that subjects a child to a substantial risk of serious injury, as well as to a risk of death, because exposure to either type of risk can endanger the child's life." Id.

The evidence clearly showed conduct by Barrett that subjected Patricia to a substantial risk of serious injury or death. It might well have been Patricia's rather than Joshua's cold and blue body Griffith found under the laundry basket on that fateful morning.

Accordingly, we find the evidence sufficient to support Barrett's conviction for the criminal neglect of both Patricia and Joshua, and we will affirm the judgment of the Court of Appeals.[8]

Affirmed.

---

[8] Barrett maintains that the present case is "strikingly similar" to Ellis v. Commonwealth, 29 Va. App. 548, 513 S.E.2d 453 (1999), where the Court of Appeals reversed the conviction of a mother who failed to turn off the gas burner in her apartment and then left her two children alone to walk some 30 to 75 yards away to visit a friend. A fire ensued, and the two children were injured. However, Ellis is distinguishable. Ms. Ellis's neglect was inadvertent, id. at 557, 513 S.E.2d at 458, Barrett's was willful.