COURT OF APPEALS OF VIRGINIA

Present: Judges Petty, O'Brien and Russell
Argued by videoconference

UNPUBLISHED

JESSE CHRISTOPHER BLACKMON, JR.

v.       Record No. 0151-20-2

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
JUDGE MARY GRACE O'BRIEN
FEBRUARY 2, 2021

FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
Edward A. Robbins, Jr., Judge

Stephen K. Armstrong (Reed Armstrong LLP, on brief), for
appellant.

Craig W. Stallard, Assistant Attorney General (Mark R. Herring,
Attorney General, on brief), for appellee.


Jesse Christopher Blackmon, Jr. ("appellant") was convicted in a bench trial of child neglect

resulting in serious injury, in violation of Code § 18.2-371.1(A). On appeal, appellant challenges

the sufficiency of the evidence to support that conviction.

BACKGROUND

We consider the facts "in the light most favorable to the Commonwealth, the prevailing

party at trial." Gerald v. Commonwealth, 295 Va. 469, 472 (2018) (quoting Scott v.

Commonwealth, 292 Va. 380, 381 (2016)). Under this standard, we "discard the evidence of

[appellant] in conflict with that of the Commonwealth, and regard as true all the credible evidence

favorable to the Commonwealth and all fair inferences to be drawn therefrom." Id. at 473 (quoting

Kelley v. Commonwealth, 289 Va. 463, 467-68 (2015)).

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

Late in the evening of November 20, 2017, appellant's wife brought their son, J.B., to the Chippenham Hospital emergency room, where a CT scan revealed internal "bleeding on both sides of [his] head." J.B., who was the youngest of the couple's three children, was nearly four months old at the time. He was transferred to the pediatric intensive care unit of the Children's Hospital of Richmond at Virginia Commonwealth University ("VCU hospital"), where doctors surgically drained two ounces of blood off his brain. He was placed on seizure medication, and a drain was inserted in his head to continue clearing blood from his brain. He remained in the hospital for twenty days.

Dr. Robin Foster, a pediatric and emergency medicine specialist at VCU hospital who was board-certified in child abuse and neglect, examined J.B. and reviewed his diagnostic tests and medical history. At trial, Dr. Foster testified that when she first saw J.B., he was "completely flaccid and limp and weak and not interacting at all," which she found "very alarming." She also observed that his head was "large or macrocephalic" even after blood had been drained. She testified that at the time J.B. was admitted to VCU hospital, his head circumference measured "[forty-six] centimeters, which is way off the growth curve in terms of size."

Dr. Foster explained that the CT scan showed J.B.'s internal bleeding was caused by two distinct head injuries. She described one injury as "an evolving subdural [hemorrhage] that had been there for a while" and the other as a more recent injury that had caused blood to collect above his right ear. She estimated that J.B. sustained the first head injury "at least two weeks" before the November 20 emergency room visit and the newer injury "from a day or so up to seven to ten days" before November 20. Although Dr. Foster could not determine the exact dates of the injuries, she testified that "the point in time where the child started acting differently than normal [was] the most . . . critical point in terms of determining timeframe."

Dr. Foster also determined that J.B. sustained retinal hemorrhages in his eyes. Both the retinal and subdural hemorrhages were consistent with an "acceleration[-]deceleration injury" which caused veins in J.B.'s head to tear and bleed onto the surface of his brain. Dr. Foster concluded that J.B. sustained "a very significant traumatic brain injury."

At trial, Dr. Foster described the importance of quickly obtaining medical care for a child with a subdural hemorrhage. She explained that allowing blood to remain on the brain has two deleterious effects: first, "blood is an irritant so it can cause seizures;" and second, after blood accumulation expands an infant's segmental skull to its maximum width, the blood causes pressure on the brain which permanently damages brain tissue. Therefore, "outcomes are always optimized by immediate care," which involves removing accumulated blood from the surface of the brain and feeding oxygen to the brain. She explained that "the sooner the child gets to treatment, the better the outcome, because as soon as that subdural [bleeding] becomes space-occupying enough that it's increasing head circumference, that means it's pushing on the brain tissue and causing damage."

According to Dr. Foster, J.B. sustained permanent brain tissue damage from his unattended subdural hemorrhage. She further opined that earlier treatment "would have improved the outcome" because less of the child's brain tissue would have been damaged.

Dr. Foster testified that her review of J.B.'s medical records reflected "a well child with normal development" who had a "head circumference [that] was not off the growth curve" as of his two-month wellness check on October 31. At that wellness check, which included a neurological examination, J.B. was documented as being within normal limits, "alert," and "well-developed." He was also examined in the Chippenham Hospital emergency room on November 5, 2017 and diagnosed with an upper respiratory infection. Notes from a follow-up appointment on November 8 indicated that J.B. was alert and interactive, and although he was experiencing some appetite loss, he did not have any issues with sleeping, lethargy, or vomiting.

After evaluating J.B.'s condition, Dr. Foster spoke with the child's parents. Appellant's wife told Dr. Foster that she brought J.B. to the emergency room on November 20 because one of his arms and one of his legs were "twitching," as if he was having a seizure. She also advised that for the last two days J.B. had not been feeding well, had "vomited some," and was "less interactive and very quiet." In contrast, appellant told Dr. Foster that J.B. had been "acting different for a longer period of time" and in fact "hadn't been acting right" since his two-month wellness check on October 31. Appellant explained that the child used to be fussy but now was very quiet and not feeding well.

Detective E.L. Baldwin of the Chesterfield Police Department interviewed appellant on November 21. Appellant told the detective that after J.B. was diagnosed with an upper respiratory infection on November 5, appellant noticed that J.B. was "not himself" and continued to decline for a week before the November 20 emergency room visit. Appellant told Detective Baldwin that during that week, J.B. had to be woken up for feedings, he would whimper but not cry, and he was unresponsive. Appellant further stated that J.B. had been projectile vomiting for a "couple days."

Appellant also related to the detective that he noticed a swelling in J.B.'s head which made it appear "like the baby's head had started to deform." He described the child's head as "really soft" and stated that "the whole side of [his] head was mushy." Appellant clarified that he noticed the deformity "about a month-and-a-half" before the November 20 emergency room visit and was concerned that J.B. "looked sort of like an alien." Appellant told Detective Baldwin that although he did not make any medical appointments for J.B. or take the child to the doctor himself, he directed his wife to do so and to ask about the child's deformed head.

At trial, appellant contradicted the statements he had made to Detective Baldwin. He testified, for the first time, that he set up multiple appointments for his wife to take J.B. to the doctor, but his wife failed to attend the appointments and lied to him about going. He claimed that

- 4 -

when he learned his wife was not attending the appointments, he made new ones and took J.B. to the doctor himself once in October and twice in November. However, the medical records introduced by the Commonwealth showed that it was appellant's wife who brought J.B. to his wellness check on October 31 and his upper respiratory infection checkup on November 8; there is no record for the November 5 emergency room visit.

The court found appellant guilty and noted the following:

> [T]he evidence establishes that your son needed medical care and you knew it. So much so that you made doctor[']s appointments and you knew that your wife wasn't going and that she was lying to you about what was happening and from that you did nothing and every moment that you did that, more of your son's brain died.

## ANALYSIS

Appellant contests the sufficiency of the evidence proving that he committed a willful act or omission or refused to provide any necessary health care for his son, J.B. "When faced with a challenge to the sufficiency of the evidence, we 'presume the judgment of the trial court to be correct' and reverse only if the trial court's decision is 'plainly wrong or without evidence' to support it." Crowder v. Commonwealth, 41 Va. App. 658, 662 (2003) (quoting Kelly v. Commonwealth, 41 Va. App. 250, 257 (2003) (*en banc*)). In other words, "[i]f there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" Chavez v. Commonwealth, 69 Va. App. 149, 161 (2018) (quoting Banks v. Commonwealth, 67 Va. App. 273, 288 (2017)).

The court convicted appellant of violating Code § 18.2-371.1(A), which provides as follows:

> Any parent . . . responsible for the care of a child under the age of [eighteen] who by willful act or willful omission or refusal to provide any necessary care for the child's health causes or permits serious injury to the life or health of such child is guilty of a Class 4 felony.

Appellant does not contest the sufficiency of the evidence establishing serious injury. He instead argues that the Commonwealth did not prove that he willfully failed to obtain proper medical care for J.B. We disagree.

The term "willful"

> often denotes an act which is intentional, or knowing, or voluntary, as distinguished from accidental. But when used in a criminal statute it generally means an act done with a bad purpose; without justifiable excuse; stubbornly, obstinately, perversely[.] The word is also employed to characterize a thing done without ground for believing it is lawful.

White v. Commonwealth, 68 Va. App. 111, 119 (2017) (alteration in original) (quoting Barrett v. Commonwealth, 268 Va. 170, 183 (2004)). "The terms 'bad purpose' or 'without justifiable excuse' necessarily imply knowledge that particular conduct will likely result in injury or illegality." Id. (quoting Barrett, 268 Va. at 183). However, the Commonwealth is not required to prove that a defendant knew what specific injury would be sustained by a child due to willful neglect. Cf. Collado v. Commonwealth, 33 Va. App. 356, 365-67 (2000) (holding that Code § 18.2-371.1(A)'s requirement that an abusive act be "willful" does not require proof that a defendant intended to cause a specific injury).

For example, in Barrett the Supreme Court affirmed a defendant's conviction under Code § 18.2-371.1(A) after she left her two-year-old daughter and ten-month-old son unsupervised for approximately six hours while she slept following a night of drinking. 268 Va. at 180. During that time, the older child put the younger in a bathtub, where he drowned. Id. at 180-81. The evidence established that the defendant was aware that her older child liked to play in the bathtub, knew how to turn on the water, and had on a prior occasion pulled the younger child into the tub headfirst while unattended. Id. at 180-82, 185. Significantly, the defendant also stated that the older child had "tried in the past" to kill the younger child. Id. at 181, 184. On appeal, the defendant contested

- 6 -

that her neglect was willful and argued that her "act of falling asleep" and leaving the children unattended was merely negligent. Id. at 184. The Supreme Court disagreed. Id. Based on the defendant's knowledge of the prior history between the children, the Court held that the defendant knew that the probable result of her neglect was that her younger child would be injured. Id. at 184-85.

Here, the evidence was sufficient to establish that appellant willfully disregarded warning signs that J.B. needed medical care.

Appellant's statements to both Dr. Foster and Detective Baldwin support the court's conclusion that appellant knew J.B. needed medical care before November 20. Appellant told Dr. Foster that J.B. "hadn't been acting right" for three weeks before appellant's wife brought him to the emergency room on November 20. When speaking to Detective Baldwin, appellant detailed the symptoms that he noticed and the timing of his concerns. Approximately "a month-and-a-half" prior to November 20, appellant noticed that J.B.'s head was deforming, growing soft and "mushy," and looking like an "alien." Appellant told the detective that J.B. started acting "not himself" as early as October 31. According to appellant, J.B.'s behavior and physical condition continued to deteriorate for about a week prior to the November 20 visit, and for a "couple days" that week the child was unresponsive, projectile vomiting, whimpering but not crying, and not eating well. Further, appellant testified that he was so concerned with J.B.'s worsening condition that he made multiple appointments for his wife to take J.B. to the doctor.

Credible evidence also supports the court's finding that appellant "knew that [his] wife wasn't going" to scheduled doctor's visits and that "she was lying to [appellant] about what was happening and from that [appellant] did nothing and every moment that [he] did that, more of [J.B.'s] brain died." Appellant testified that he knew as early as October that his wife was not bringing J.B. to his scheduled doctor's appointments and lying to appellant about going. Although

appellant claimed that he made a new appointment and took J.B. to the doctor himself in October and twice in November, he provided no medical records or other corroborating evidence to support this claim. Rather, the Commonwealth's evidence showed that it was appellant's wife, not appellant, who took J.B. to his two-month wellness check on October 31, his upper respiratory infection checkup on November 8, and his emergency room visit on November 20. Further, appellant told Detective Baldwin that he never took J.B. to the doctor himself. Because "we must discard the evidence of [appellant] in conflict with that of the Commonwealth," Gerald, 295 Va. at 473 (quoting Kelly, 41 Va. App. at 254), we hold that the court did not err in finding that appellant "did nothing" to obtain proper medical care for J.B. even though he knew that the four-month-old child needed it.

Accordingly, we affirm appellant's conviction for child neglect in violation of Code § 18.2-371.1(A).

Affirmed.