COURT OF APPEALS OF VIRGINIA

Present:   Judges Athey, White and Frucci
Argued at Lexington, Virginia

**PUBLISHED**

CHRISTIANA LEIGH JUSTICE

v.        Record No. 1515-23-3

COMMONWEALTH OF VIRGINIA

OPINION BY
JUDGE KIMBERLEY SLAYTON WHITE
OCTOBER 1, 2024

FROM THE CIRCUIT COURT OF ROANOKE COUNTY
James R. Swanson, Judge

John S. Koehler (Suzanne Moushegian; The Law Office of James
Steele, PLLC, on brief), for appellant.

Virginia B. Theisen, Senior Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.

Christiana Leigh Justice was convicted in a bench trial of felony homicide and the predicate offense of felony child neglect for administering methadone-laden medication to her infant son J.G.,[1] who died as a result.  Justice repeatedly told law enforcement officers that J.G. was alive on the morning that she had called emergency services after finding him unresponsive in bed.  Medical and testimonial evidence established that the child likely died the evening before and contradicted Justice's explanations of how the incident occurred.  The trial court found against Justice on the only disputed element of the charges—that she acted willfully in giving J.G. the lethal medication.

---

[1] We use initials, rather than names, to protect the privacy of minors because J.G. is survived by his twin brother.

The only issue on appeal is whether the evidence is sufficient to find that Justice acted willfully under the child neglect statute.[2] Justice asserts that a reversal on that ground of the child neglect conviction would thus require a reversal of the felony homicide conviction. Bound by our deferential standard of review when assessing a trial court's findings of fact, we hold that the evidence was sufficient and affirm the convictions.

BACKGROUND

Around 6:35 a.m. on the morning of October 21, 2021, Police Officer Jeremy Shrewsbury was dispatched to the apartment building of Christiana Leigh Justice, mother of two fifteen-month-old twin boys. He entered Justice's apartment and saw rescue personnel in the back bedroom working to resuscitate one of the twins, J.G., while Justice held the other twin in the living room, "very upset." Justice told Shrewsbury that she had called 911 after finding that J.G. was not breathing and was cold to the touch. She said that when she had tried to give him CPR the baby's mouth had released vomit. As EMS carried J.G. out of the apartment, Shrewsbury saw his "limp [limbs] hanging down" and his face "gray and blue." The child was pronounced dead at the hospital.

Lieutenant Scott Hurt arrived five minutes after Shrewsbury and asked Justice what had happened. Justice told him that she woke to J.G. crying just before 5:00 a.m. She let him cry for fifteen minutes, then went to him and consoled him with a bottle of juice before she returned to the couch to go back to sleep. When she left the bedroom, J.G. started crying again but stopped at 5:50 a.m. Justice said that she woke up for work at 6:00 a.m., spent fifteen minutes getting

---

[2] Justice's counsel endeavored to raise a new legal position at oral argument. Counsel argued that the amended language in the felony homicide indictment added a more stringent mens rea requirement for that crime that the Commonwealth then had to prove. We decline to address the merits of this argument because it was not preserved below by objection or argument, is not encompassed in Justice's assignment of error, and was not briefed on appeal. *See* Rules 5A:18, 5A:20.

ready, then went to the children. She observed that J.G.'s face was blue and his body cold to the touch. When she performed CPR, he threw up a pink substance.

Hurt asked Justice whether she knew of any illegal drugs in the residence that J.G. might have ingested. She said that she was not aware of any but that visiting friends may have brought some into the home and left them there. Justice admitted that she went to a methadone clinic. She first told Hurt that she only took methadone at the clinic, but then stated that she had received take-home doses two or three weeks prior but had not had any in the home since then.

Justice stated that both twins had been prescribed a "liquid antibiotic" for a past illness and still had "low grade fevers" and "runny noses." Between 5:30 and 6:00 p.m. the evening before, she gave some of the antibiotic to J.G., but not to his brother.

A third and final law enforcement agent, Detective Valerie Cummings, arrived on scene between 7:00 and 8:00 a.m. Having given Justice *Miranda*[3] warnings, Cummings asked her questions about what happened. Justice said she had given both twins Tylenol or Motrin the evening before but had given a "pink liquid" antibiotic to J.G. alone, for which she did not give a name or further description. She told Cummings that she had then put the twins to bed around 6:45 p.m. Consistent with the answers she gave Hurt, Justice explained that she woke up at 5:00 a.m. to J.G. crying, that he stopped crying around 5:50, and that when she checked on him again shortly before 6:30 he was cold and unresponsive, prompting her to perform CPR and call 911. She also told Cummings that she did not have any narcotics in her home but goes to a methadone clinic and that while she does not bring any methadone into the home, there may be some in a lock box in her car. The lock box found in her car did not have any methadone in it.

Cummings searched the bathroom and found the prescription bottle to which Justice had referred on the bathroom counter next to an oral syringe. The bottle held a pink liquid and was

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

labelled "Fluconazole for Oral Suspension USP."  Significantly, the label did not have a patient's name on it.  Forensic analysis of the pink liquid in the syringe and bottle revealed that they both contained methadone.  In fact, the bottle's liquid had ten times more methadone in it than Fluconazole, the medication named on the label.

Justice agreed to submit to a recorded interview with Cummings two months after the incident, where she repeated her claim that she woke in the morning to J.G. crying but that he had stopped shortly before she discovered him unresponsive.  She told Cummings that she had given both twins Tylenol or Motrin but had also used a baby syringe to give J.G. some antibiotic medication that was "leftover from a recent doctor's visit."  Justice said that she had "just" gotten the medication bottle "back" from the twins' father following a visit.  She then stated that the father was the one who took the twins to the doctor several weeks earlier and got the medication.  Initially unclear as to whether she had the bottle to begin with or the father did, it appeared to Cummings that Justice "ultimately end[ed] up" saying that the father had obtained the bottle first.  She told Cummings that she had been "comfortable with allowing" the father "a lot more visitation" than normal in the weeks preceding the incident.

Justice denied tampering with the contents of the bottle.  She stated that she did not "do anything" to it while she possessed it and that she had believed the bottle contained only antibiotics when she administered it to J.G.  She claimed that if the bottle was tampered with, it was the father who did it.  When Cummings responded that the father would not do such a thing, Justice said "[y]es, he would," telling Cummings that she was being "framed."  She called the father "a psychopath" who had called the police three days before the incident with a false tip that Justice was "trying to kill [her] kids."  She further claimed that the father was "the last person who had that medication" and that she "ha[d not] even had the medication" herself.  Cummings testified that the father had been incarcerated for a week leading up to the incident.

J.G.'s autopsy showed that his cause of death was acute methadone poisoning. Methadone suppresses the body's ability to breathe, especially a body that lacks tolerance toward the opiate. A blood sample taken from the child's heart was found to contain methadone in amounts three times greater than what the medical examiner determined was a "lethal" level.[4] The examiner testified that the amount of methadone in J.G.'s body was high enough to kill an adult.

J.G.'s autopsy also uncovered facts strongly suggesting that the child had died the night before, rather than in the morning. His body's temperature was measured at the hospital at 82.6 degrees, a lower temperature than the medical examiner would expect given a dead body's rate of heat loss. Additionally, the examiner observed "clearly visible" and "very obvious" food remains in J.G.'s stomach consisting of "soft" materials like mandarin oranges and bread. There was also "pink material" mixed with the food remains. The medical examiner testified that there would likely have been "much more digestion" of the food remains if J.G. had eaten around 6:00 p.m. and died around 6:00 a.m. the following morning as Justice asserted. In view of the body's low temperature and the undigested food in the stomach, the examiner concluded that J.G. likely died "closer to dinner than to when he was found."

Justice was indicted for felony child neglect, Code § 18.2-371.1(A), and felony homicide, Code § 18.2-33. On the day of the bench trial, the felony homicide indictment was amended to allege that Justice killed J.G. "accidentally and contrary to her intention" while committing the predicate felony of child neglect. The Commonwealth presented evidence from the three officers, the forensic analysis, and the medical examination.

---

[4] The child's heart blood also was positive for Naloxone, commonly known as Narcan, "a narcotic antagonist used to counter the central nervous system depression effects of opioids, including respiratory depression."

Justice moved to strike the evidence for both charges. She argued that the Commonwealth's evidence was not sufficient to prove that she had the requisite intent of willfulness for the child neglect charge. She argued further that dismissing the child neglect charge would require the dismissal of the felony homicide charge, too, as the child neglect charge was the required underlying offense for the felony homicide.

The trial court denied Justice's motion to strike, concluding that Justice had administered the "[m]ethadone laden . . . antibiotic" to J.G. and finding that her explanations of what happened were "totally belied" by the scientific evidence. The trial judge overruled Justice's renewed motion to strike as well, holding that she "knew or should have known" that the antibiotic she gave to J.G. contained methadone and finding the evidence to be sufficient to convict on both charges. Formal adjudication was taken under advisement until a hearing four months later. At that hearing, the trial judge stated that Justice did not "intend to bring about" J.G.'s death, yet she "caused" it. She was found guilty of both charges and sentenced to 25 years in prison, 12 of which were suspended.

On appeal, Justice asserts that the evidence presented is insufficient to prove that she acted willfully in giving J.G. the methadone-laden medication. She argues that the requisite intent for the child neglect charge is absent and requests that we reverse both convictions. Finding that the trial court was not plainly wrong to conclude that she acted willfully, we disagree and affirm.

ANALYSIS

"When an appellate court reviews the sufficiency of the evidence underlying a criminal conviction, its role is a limited one." *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024). "The judgment of the trial court is presumed correct and will not be disturbed unless it is 'plainly wrong or without evidence to support it.'" *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)

- 6 -

(quoting Code § 8.01-680). An appellate court must view the evidence in the light most favorable to the Commonwealth, the prevailing party at trial, and may neither "find facts nor draw inferences" favorable to the losing party that were not found by the trial court. *Garrick*, 303 Va. at 182. This limiting rule applies even to facts that "*could* have [been] found" by the trial court but were not. *Id*. Thus, where enough evidence supports the trial court's finding, the appellate court "is not permitted to substitute its own judgment for that of the trier of fact, even if its opinion might differ from the conclusions reached by the trier of fact." *Jordan v. Commonwealth*, 286 Va. 153, 156-57 (2013) (citing *Startin v. Commonwealth*, 281 Va. 374, 379 (2011)).

It is a felony for a person responsible for a child's care to commit "a willful act or willful omission" that causes "serious injury" to the child. Code § 18.2-371.1(A). An act is willful if it is intentional, purposeful, or involves a reckless disregard that injury will probably result from it. *Commonwealth v. Duncan*, 267 Va. 377, 384-85 (2004); *Barrett v. Commonwealth*, 268 Va. 170, 183 (2004). Willfulness is synonymous with criminal negligence or recklessness and is judged under an objective standard that asks whether the actor "knew or should have known the probable results" of her acts. *Miller v. Commonwealth*, 64 Va. App. 527, 543-44 (2015) (quoting *Jones v. Commonwealth*, 272 Va. 692, 701 (2006)). Determining willfulness is fact specific, *id*. at 544, and "depends entirely on the circumstances of each case," *see Barnes v. Commonwealth*, 47 Va. App. 105, 113 (2005). One fact that the trial court may consider in finding reckless disregard is an act that "subjects a child to a substantial risk of serious injury, [or] to a risk of death." *Duncan*, 267 Va. at 385.[5]

---

[5] Justice in her brief makes the bold assertion that "willfulness requires proof of intent." She fails to cite any authority other than a reference to a Black's Law Dictionary and fails to address any of the controlling authority listed herein.

The Commonwealth asserts that the facts of this case resemble those in *Barrett*. In *Barrett v. Commonwealth*, the Supreme Court upheld a finding of willfulness under Code § 18.2-371.1(A) where a mother returned home in the morning after a night of drinking, fell asleep, and upon waking found that her nearly three-year-old daughter had drowned her ten-month-old son in the bathtub. 268 Va. at 173-74, 179-80, 184. The mother argued that her act of falling asleep only amounted to ordinary negligence, not reckless disregard. *Id.* at 184. The Court disagreed, stating that her act cannot be viewed in a vacuum but rather "in light of all the circumstances" surrounding it. *Id.* The Court reasoned that since the mother knew of past instances of the daughter's abusive conduct toward the son, she had "recklessly disregarded" the risk the daughter posed to the son when she fell asleep. *Id.* By disregarding the known risk of harm to the child and going to sleep while intoxicated, the mother "created a situation" in which it was "not improbable that injury" would occur, and a factfinder could "charge[] [her] with the knowledge of[] the probable results" of her act of falling asleep. *See id.* at 184 (quoting *Cable v. Commonwealth*, 243 Va. 236, 240 (1992)). Thus, it was not plainly wrong to find the mother's act of falling asleep to be willful under the felony child neglect statute.

We agree that *Barrett* is apposite to the case before us. Like the mother in *Barrett*, Justice's act of administering the tainted medication to J.G. supports a finding that she knew or should have known the danger of her act when viewed in light of all the circumstances.

First, the trial court found that Justice's act caused J.G.'s death.[6] Justice told Lieutenant Hurt that she gave J.G. what she termed the "antibiotic" liquid contents of the prescription bottle the evening before the incident. The scientific evidence shows that methadone poisoning was the cause of J.G.'s death. Though Justice said that she believed the liquid had only antibiotics in it, the bottle's contents tested positive for methadone and contained ten times more of it than the

---

[6] Justice does not allege error to this finding of the trial court.

medication labeled on the bottle.  The trial court found the drastic quantity of methadone in the bottle to be "particularly troubling" when paired with the fact that Justice was the one who gave it to the child.  The bottle did not have a patient's name on it, contradicting Justice's statement that the twins had been prescribed the antibiotic for a recent illness.

In addition to administering a lethal dose of methadone to J.G., Justice's regular use of methadone supports an inference that she knew or should have known that the bottle contained methadone in harmful amounts.  She was familiar with methadone but gave conflicting accounts of where she kept it when she used it.  She stated variously that at times she had some in her apartment but would return the bottles to the clinic, that she had not had methadone in her home for at least two weeks prior to J.G.'s death, only taking it at the clinic, and that she did not bring methadone into her home at all but kept it in a lock box in her car.  A search of the lock box did not reveal any methadone inside it.

Furthermore, Justice gave contradicting statements concerning the father in an apparent effort to shift blame.  She stated several times that if the medicine in the bottle held any harmful substance, the father put it there.  She called him a "dangerous man" and a "psychopath," while nonetheless saying that she had been "trying to help him" see the twins more because he was "doing a good job."  The credibility of Justice's accusations against the father was substantially undermined by testimony establishing that he had been incarcerated for at least a week before the incident.

She told Detective Cummings that she had gotten the bottle "back" from the father after the twins visited him at his house.  Yet she also claimed that he was the one who took the twins to the doctor in the first place, obtained the medication, and brought it to Justice.  She next claimed that she had had the written prescriptions, which the father then filled and retrieved,

before finally stating that the father had in fact taken the twins to the doctor himself and picked up the prescription. She did not remember for which twin the medication had been prescribed.

Last and most critically, Justice's story of how the incident unfolded is inconsistent with the scientific evidence showing that the child likely died nearer the evening than the morning. Justice told Detective Cummings that she had fed the twins around 6:00 p.m. on the evening before she found J.G. dead. When asked, she "consistent[ly]" told investigators that J.G. woke up crying the following morning, shortly before 5:00 a.m. Yet J.G.'s body temperature was notably low and his stomach held undigested food. Given the average rate of temperature loss and speed of digestion, the medical examiner opined that "probably at least five hours" would have had to pass following death for J.G.'s temperature to drop so low and noted that mandarin oranges, "not the most sturdy pieces of food to begin with," were still whole and "barely" digested in his stomach. The examiner thus concluded that in "all likelihood" J.G. died closer to his meal the night before than to 5:00 a.m. Accordingly, the scientific evidence points to midnight as the latest hour at which J.G. may have passed away. This evidence squarely contradicts Justice's story that she woke to J.G. crying in the morning and that he died shortly thereafter. The trial court found the scientific evidence credible and did not err in crediting it over Justice's shifting stories.

CONCLUSION

The trial court found that Justice acted willfully and caused her infant son J.G. to die from methadone poisoning. We review that finding by asking whether "*any* rational trier of fact" could have held that she acted with the willfulness required by the felony child neglect statute. *See Garrick*, 303 Va. at 182 (internal quotations and citations omitted). Justice gave the methadone-laden medication to her infant son, is familiar with methadone, and gave testimony that was contradicted by its own terms and by the scientific evidence. We thus conclude that a

- 10 -

rational trier of fact could have held that Justice possessed the requisite willfulness.  We affirm her convictions for felony child neglect and felony homicide.

*Affirmed.*